**COUNTRYWIDE HOME LOANS, INC. and LandSafe Services, Inc., Appellants,**

v.

**KENTUCKY BAR ASSOCIATION, Appellee.**

**Kentucky Land Title Association, Appellant,**

v.

**Kentucky Bar Association, Appellee.**

**Kentucky Association of Realtors, Inc. and Home Builders Association of Kentucky, Inc., Appellants,**

v.

**Kentucky Bar Association, Appellee.**

**Kentucky Bankers Association, Appellant,**

v.

**Kentucky Bar Association, Appellee.**

Nos. 2000–SC–0206–KB to 2000–SC–0209–KB.

Supreme Court of Kentucky.

Aug. 21, 2003.

Richard A. Vance, Stites and Harbison, Louisville, Counsel for Appellants, Countrywide Home Loans, Inc. and Landsafe Services, Inc.

Gregory P. Parsons, J. Jeffrey Patterson, Stites and Harbison, Lexington, Counsel for Appellant, Kentucky Land Title Association.

Matthew R. Hall, U.S. Department of Justice, Civil Division, John P. Fonte, Joel I. Klein, Assistant Attorney General, A. Douglas Melamed, Deputy Assistant Attorney General, Robert B. Nicholson, Jessica N. Butler–Arkow, U.S. Department of Justice, Washington, D.C., Counsel for United States of America, Amicus Curiae.

Glenn E. Acree, Glenn Acree law Office, Lexington, Counsel for Appellants, Kentucky Associaton of Realtors, Inc. and Home Builders Association of Kentucky, Inc.

John T. McGarvey, M. Thurman Senn, Morgan and Pottinger, PSC, Debra K. Stamper, Vice President and General Counsel, Kentucky Bankers Association, Louisville, Counsel for Appellant, Kentucky Bankers Association.

Benjamin Cowgill, Bruce K. Davis, Executive Director, Reid Allen Glass, Kentucky Bar Association, Frankfort, Counsel for Appellee, Kentucky Bar Association.

KELLER, Justice.

## I. INTRODUCTION

On March 1, 2000, Movants, Countrywide Home Loans, Inc. ("Countrywide") and LandSafe Services, Inc. ("LandSafe"), Kentucky Land Title Association ("KLTA"), and Kentucky Association of Realtors, Inc. ("KAR") and Home Builders Association of Kentucky, Inc. ("HBAK"), moved under SCR 3.530(5) [1] for this Court

---

**1.** "Any person or entity aggrieved or affected by a formal opinion of the Board may file with the Clerk within thirty (30) days after the end of the month of publication of the KENTUCKY BENCH & BAR in which the full opinion or a synopsis thereof is published, a copy of the opinion, and upon motion and reasonable notice in writing to the Director, obtain a review of the Board's opinion by the Court. The Court's action thereon shall be final and the Clerk shall furnish copies of the

to review Advisory Opinion U–58, adopted by the Kentucky Bar Association ("KBA") Board of Governors in November 1999 and published in the January 2000 issue of *Kentucky Bench & Bar*. U–58 declares that performance of a real estate closing by a lay closing agent is the unauthorized practice of law. Movants request that the Court vacate U–58, and, in support of that request, argue that U–58 is contradictory to both public policy and U–31, a previous advisory opinion that had allowed laypersons to conduct real estate closings subject to certain limitations. On March 2, 2000, Movant, Kentucky Bankers Association ("Bankers"), filed a similar motion and requested that this Court clarify that U–58 does not change U–31 to the extent that the earlier opinion permitted banks and other lending institutions to close real estate transactions when they provide lender services. We granted the motions to review U–58, allowed the parties to take evidence, and heard oral argument on the issues. We now vacate U–58 and hold that U–31 accurately states the law regarding lay closing agents' ability to perform real estate closings in Kentucky.

## II. BACKGROUND

The Unauthorized Practice Committee of the KBA may submit to the KBA Board of Governors recommendations for advisory opinions delineating what activities constitute the unauthorized practice of law.[2] If the recommended opinion is approved by three-fourths of the Board of Governors, it carries the weight of an advisory opinion.[3] This Court, however, is not bound by its terms. On proper request by

an aggrieved party, we have the authority to evaluate the opinion and determine whether it accurately states the law.[4] Movants made such a request in this case as to U–58, and we therefore decide whether the conduct of a real estate closing by a lay closing agent is the unauthorized practice of law. We begin with a discussion of the development of U–58.

In 1981, the Kentucky Bar Association Board of Governors rendered Opinion KBA U–31, which addresses essentially the same issue that was later addressed in U–58 and that is now presented for our review. U–31 asked:

> Does a real estate mortgage lender, or a title insurance company on behalf of a real estate mortgage lender, commit the unauthorized practice of law by performing the ministerial acts necessary in the closing of a real estate loan?[5]

The Board of Governors answered with a "qualified no." Essentially, U–31 permitted laypersons to conduct real estate closings so long as they avoided giving legal advice. Specifically, the opinion instructed that when a question of a legal nature is asked at a closing "the lay person should discontinue the closing and seek proper legal advice."[6] In reaching this conclusion, the Board of Governors recognized that "[a] 'real estate closing' is at best ministerial in nature. Some lawyers will allow secretaries and paralegals to participate in closings. The closing, which consists mainly of financial matters, payments, schedules of payment, and insurance, is basically a nonlegal function."[7] The Board did, however, offer a warning

---

formal order to the original petitioner, the movant and the Director." SCR 3.530(5).

**2.** SCR 3.530(2).

**3.** SCR 3.530(3).

**4.** SCR 3.530(5).

**5.** Opinion KBA U–31 (March 1981).

**6.** *Id.*

**7.** *Id.*

that "[f]ederal loans involve significant knowledge of the law, and questions as to what is meant in the documents would certainly involve the unauthorized practice of law." [8]

More than fifteen years after the Board of Governors issued that warning, the role of non-lawyer closing agents was again at issue. Marcus Carey, chairperson of the KBA's Unauthorized Practice Committee, was advised by several Kentucky real estate attorneys of their concerns that title insurance companies and title agencies might be engaged in the unlawful practice of law when they closed real estate transactions without the participation of or supervision by licensed attorneys. Carey determined that this was the type of issue that his committee was charged with addressing and raised the issue before the Unauthorized Practice Committee.

When the issue was raised, several attorneys showed an interest in assisting the Committee and the KBA in resolving the issue, and they formed an ad hoc committee, which researched the issues and drafted a proposed opinion. After some nine or more drafts of the opinion, this ad hoc committee submitted its opinion to Carey and his Unauthorized Practice Committee on August 2, 1997. The opinion underwent several changes during floor debates in the Committee, but was eventually submitted to the KBA Board of Governors for its approval. The Board rejected the opinion, returning it to the committee for further review and consideration.

After the draft opinion's rejection, the ad hoc committee disbanded. Still, there was concern that title insurance companies and title agencies were involved in the unauthorized practice of law. The Unauthorized Practice Committee thus continued its work on the issue, and, in 1999, the Committee submitted a revised opinion to the Board of Governors. The opinion was adopted by the Board in November 1999, and it was published as U–58 in the January 2000 issue of *Kentucky Bench & Bar*.

After the opinion was published, petitioners moved this Court, under the authority of SCR 3.530(5), to evaluate U–58. They urge us to review and vacate U–58 and reinstate U–31 as the law on layperson-conducted real estate closings in Kentucky. We begin our evaluation of U–58 with the text of the opinion.

### U–58

Question: May real estate closings be conducted by persons who are not real parties in interest without direct supervision of a licensed attorney?

Answer: No.

Question: May title agencies or title insurance companies conduct real estate closings?

Answer: No.

### Unauthorized Practice of Law

Only licensed attorneys may practice law in Kentucky. The practice is regulated exclusively by the court. The compelling reason for such regulation is to protect the public against rendition of legal services by unqualified persons. Kentucky Rule of Professional Conduct (RPC) 5.5. The practice of law is defined by SCR 3.020 as any service: "involving legal knowledge or legal advice, whether of representation, counsel or advocacy in or out of court, rendered in respect to the rights, duties, obligations, liabilities, or business relations of one requiring the services."

The "unauthorized" practice of law is the performance by those services contained in the definition by "non-lawyers" for "others."

8. *Id.*

It is not the unauthorized practice of law for a party to a real estate transaction to represent himself or to prepare closing documents to which he is a real party in interest, provided that no fee is charged to any other party. SCR 3.020. Otherwise only a licensed attorney may represent a closing party, prepare conveyancing or mortgage instruments, or charge a fee for legal services related to a real estate transaction. *Frazee v. Citizens Fidelity Bank & Trust Co.,* 393 S.W.2d 778 (Ky.1965); *Federal Intermediate Credit Bank of Louisville v. Kentucky Bar Association,* 540 S.W.2d 14 (Ky.S.Ct.1976).

### Real Estate Closings

Real estate closings typically have either two or three real parties in interest: seller and buyer, borrower and lender, or seller, buyer-borrower, and lender. Of these three, the least complex are the two-party closings of single sale or loan transactions involving the transfer of an interest in real estate, by deed or mortgage, for purchase money or loan proceeds. The sale of real estate financed by a third party lender is the more complex because it involves separate sale and secured loan transactions in a simultaneous closing.

The "conduct" of a closing is the culmination of such transactions. Notwithstanding the standardization of real estate closing documentation, it is unrealistic and naive to assume that, in all instances, the settlement agent can present important legal documents to the seller, buyer, borrower, and/or lender at a closing without legal questions being asked and without giving legal advice. The preparation and presentation of closing documents is an implied representation that the documents fulfill the requirements of the parties' contractual commitments and the law, and that the documents have been reviewed and found to be legally sufficient. Real estate closings should be conducted only under the supervision of an attorney because questions of legal rights and duties are always involved, and there is no way of assuring that lay settlement agents would raise, or would not attempt to answer, the legal questions. *State v. Buyer's Service Co.,* [292 S.C. 426] 357 S.E.2d 15 (S.C.1987). Whether stated or not, the person conducting the closing vouches for the legal sufficiency of the documents, whether complex, simple, or pre-printed. It does not matter whether the instruments are deemed simple or complex. As Judge Pound said when closing transactions were much less complicated than today, "the most complex are simple to the skilled, and the simplest often trouble the inexperienced." *People v. Title Guaranty [Guarantee] and Trust,* [227 N.Y. 366] 125 N.E. 666 (N.Y.1919).

The legal questions present at a closing, whether asked or should be asked, are endless, as demonstrated by the attached appendix of issues affecting the quality of title and enforceability of documents. In summary, the contract of sale or the loan commitment must be reviewed and interpreted for contract compliance and remedies. Sufficiency of the legal description or survey plat and access to public ways and utilities must be determined. The title opinion or title insurance commitment must be reviewed and interpreted to inform the purchaser of its meaning and potential risks, and the effect of restrictions, encumbrances, and other title exceptions. The closing documents must be explained.

By its very nature a real estate closing involves substantial rights and liabilities. The parties approach the closing having made commitments with other

parties and invested time and money in anticipation of a mutual understanding of their contractual obligations and trusting that all legal issues have been properly addressed. If a problem arises during closing and there is no attorney-client relationship, the parties are without the benefit of independent counsel and may lack the leverage or will to halt a transaction that is not in their best interests.

### Closing Supervision by Attorney

An attorney need not be physically present at the closing, so long as it is in fact conducted under his supervision and control, but the responsible attorney must be familiar with the documentation and be available at the time of closing for consultation. He bears ultimate responsibility for the closing and is subject to disciplinary action for any act or omission which otherwise would be misconduct by him or his closing employees, as well as being legally accountable under the duty imposed by *Seigle v. Jasper*, 867 S.W.2d 476 (Ky.App.1993). By failing to attend or supervise a closing, the attorney who is responsible for the documentation or who has examined and opined on the quality of title may be guilty of aiding or assisting lay settlement agents in the unauthorized practice of law contrary to SCR 3.470.

### Closing by Institutional Lender

When an institutional lender is a real party in interest to a real estate transaction as mortgagee, its lay employee or in-house attorney may preside over the mortgage closing with a customer not represented by an attorney. Though institutional lenders, namely banks, savings and loans, and Farm Credit Services are not subject to the same disciplinary action as attorneys, the public is protected to some degree by state and federal requirements for licensure, capi-talization, oaths of directors and officers, insured deposits, and other regulations. The lender's employee may attend to the ministerial issues of financial matters, payments, and insurance related to the loan, as these are commonly nonlegal functions. KBA U–31.

The lender's employee may also prepare or select and complete necessary "form" loan documents if no fee is charged, directly or indirectly, for such services, provided that the lender's own attorney or some other licensed attorney passes judgment on and is responsible for the documents as finally executed. *Federal Intermediate Credit Bank of Louisville*, supra.

However, institutional lenders may not by their employees or salaried attorneys provide title opinions to their borrowers because the "analysis of recorded interests in land coupled with an opinion as to its legal status" is a service lawfully performed for others only by a licensed attorney. *Kentucky State Bar Association v. First Federal Savings & Loan Association of Covington*, 342 S.W.2d 397 (Ky.1961). Moreover, no lender's lay employee may undertake to give legal advice to or answer any questions posed by the borrower or any other transaction party involving interpretation of legal provisions of closing documents or other matters requiring legal knowledge or skill. When a legal question is asked or becomes apparent, the institutional lender employee should suspend the closing to consult legal counsel in order to avoid the unauthorized practice of law. (*See* KBA U 31.) Such employee may not conduct any part of a real estate closing other than the mortgage loan.

### Closing by Title Companies

A distinction must be made as to lay settlement agencies such as title compa-

nies and title insurance companies which are not real parties in interest to the real estate or loan transactions. Their only interest is the payment of settlement fees. They act only as a conduit to exchange funds and documents. A lay settlement agency may compile and report factual information from the public records, including abstracts of title, but may not render title opinions. They may act as an agent or broker in connection with the issuance of title insurance commitments and policies and may provide clerical services for a closing. KBA U–21; U–31. They do not conduct a closing or examine the required documents with an eye for protecting the independent legal rights of the seller, buyer, or lender. Such agencies are not regulated and owe no legal duties to the parties other than those imposed by agency or tort law. Their employees have no mandated educational prerequisites for real estate transactions or disciplinary oversight. A title agency may not conduct real estate closings or mask legal fees for closing services under the guise of a "settlement fee" or other charge. Their conduct of a closing absent independent legal counsel constitutes the unauthorized practice of law. Virginia UPL Opinion # 183 (1996); Annotation, 85 A.L.R.2d 184.

*Appendix*

*Typical Questions at Real Estate Closings That May Involve Legal Advice*

●the legal name, existence, and authority of an entity-grantor;

●the nature of the estate and quality of title conveyed;

●the effect of survivorship title on estate plans;

●the difference between special and general warranties, or no warranty at all, and the purchaser's remedies for title defects;

●generic deed exceptions for easements and other encumbrances of record;

●closure of a metes and bounds description or other description deficiencies;

●rights of access to public ways and utilities;

●interpretation and impact of zoning and other land use regulations;

●completion of promised improvements by the seller or subdivider;

●air and mineral rights;

●significance of deed covenants, conditions, and restrictions;

●upstream and downstream surface drainage;

●the presence of unacceptable dominant easements, or the lack of necessary servient easements appurtenant;

●the effect of adverse possession, prescriptive use, and the champerty statute;

●eviction of tenants and trespassers;

●release of statutory liens for labor and materials furnished, unemployment contributions and federal and Kentucky death taxes;

●survey and other exceptions in the preliminary title opinion or title commitment;

●what title policies cover and what they exclude;

●the duties and liability of title attorneys, real estate agents, and lenders;

●the rights to and limitations of future advances under open-end loans;

●remedies against defaulting parties;

●interpretation of environmental site assessments and remediation of contamination;

●survival of warranties, representations, and covenants, and indemnification;

●claims for latent defects in buildings;

●disclaimers in homeowner's warranties and termite inspection reports;

●disclosures of condition of property improvements, or of the agency and loyalty of a broker;

●the tax consequences of various matters in the closing;

●the effect of marital dissolution upon loan obligations; or

[sic]

## III. PARTIES, ARGUMENTS, AND EVIDENCE

U–58 has a potential impact on nearly all of the regular participants in real estate transactions. The parties to this motion are representative of most of the affected individuals, although in addressing the issue before us, we must balance the concerns of these parties with the interests and largely-unvoiced concerns of real estate consumers across this state.

Countrywide, a New York corporation and subsidiary of Countrywide Credit Industries, Inc., is a mortgage loan company that makes residential mortgage loans in Kentucky and nationwide. LandSafe, a Pennsylvania Corporation and second-tier subsidiary of Countrywide Credit Industries, Inc., is a title company that provides settlement services for mortgage loan closings and acts as an agent in the sale of title insurance. LandSafe transacts business in several states, although not in Kentucky. It does, however, have plans to conduct business in Kentucky in the near future. Together, these companies urge us to vacate U–58.

In support of their motion, Countrywide and Landsafe assert that "the KBA's Unauthorized Practice of Law Committee suffered from a lack of input from interested parties and informed sources outside the members of the state bar." They contend that the evidence produced by the KBA suffers from the same lack of perspective, and maintain that the evidence produced by Movants, which is summarized below in

Part IV(A), provides the needed insight. Although they contend that the KBA has produced no evidence that the actions of lay closers significantly increase errors, defalcations, or consumer injury, Countrywide and Landsafe maintain that, in any event, when a layperson conducts the closing, buyers are afforded protections akin to those available when an attorney closes the loan. They also assure us that the standardization of real estate transactions, which has resulted from technological advances in the industry as well as growth and development in the secondary mortgage market, has reduced the complexity of real estate transactions and limited the amount of negotiation that occurs. Further, these industry representatives argue that U–31 properly concluded that lay closing agents are perfectly competent to conduct closings, which consist primarily of exchanging documents and disbursing payments, and suggest that U–58 places the closing attorney in a conflict-of-interest position by implying that he or she should give advice to parties that the attorney does not represent. Countrywide and Landsafe also emphasize that the presence of lay closing agents contributes to a more competitive market for real estate consumer services, and maintain that U–58 is merely an attempt by the real estate bar to thwart competition. Accordingly, they urge us to follow the majority of other jurisdictions by clarifying that laypersons may conduct real estate closings in Kentucky without engaging in the unauthorized practice of law.

KLTA is an association of title companies and agents that attempts to: (1) promote the general welfare of the abstract and title insurance industry; (2) promote professional standards and ethics; (3) promote the safe and efficient transfer of ownership of and interests in real property within the free enterprise system; (4) pro-

vide information and education to consumers, to those who regulate, supervise, or enact legislation affecting the land title industry, and to its members; and (5) maintain liaison with governmental agencies and users of the products and services provided by its members. KLTA also petitions this Court to vacate U–58, and similarly argues that there is no evidence of any changes in the real estate market that would warrant a change from U–31. Specifically, KLTA argues that a real estate closing is ministerial or administrative in nature—particularly since the transaction has become so standardized—and suggests that the closing rarely, if ever, engenders the types of legal questions hypothesized by U–58. KLTA maintains that there is a critical distinction between giving black-letter explanations of legal principles and providing individualized legal advice and that only the latter of these constitutes the practice of law. Because a closing can be, and most are, conducted without the closing agent's dispensation of individualized legal advice, KLTA contends that the conduct of a real estate closing is not the practice of law. Finally, KLTA urges that even if this Court were to find the conduct of a real estate closing to be the practice of law, it should authorize the practice. Essentially, KLTA argues that barring lay closing agents from the closing room will harm the public unnecessarily because: (1) title companies produce high quality work; (2) closings remain affordable because of the competition created by title companies; and (3) title companies are substantially regulated by both insurers and lenders. Like Countrywide and LandSafe, KLTA urges us to follow those jurisdictions that allow laypersons to conduct closings.

KAR and HBAK have joined in the request for review of U–58 on behalf of realtors and home builders across Kentucky. They emphasize the economic advantages of lay closing agents and argue that they will be adversely affected by the higher closing costs, decreased housing affordability, and longer delay in home purchases that they claim will accompany U–58. Further, they characterize U–58 as "an effort to monopolize real estate closings for lawyers" and insist that U–58 rests on faulty assumptions, i.e., (1) that legal questions arise at nearly all closings, (2) that lay closing agents will not be able to resist answering these questions, and (3) that they will inevitably do so incompetently. For these reasons, they ask us to vacate U–58.

Bankers is a non-profit trade association, consisting of 284 member banks and thrifts having offices in Kentucky, that is concerned primarily with whether U–58 changes U–31, i.e., whether the performance of ministerial tasks of completing promissory notes, mortgages or other documents integral to the closing without the supervision of an attorney, which were permissible under U–31, constitutes the unauthorized practice of law. They assure us that the evidence in this case indicates that the KBA did not intend for U–58 to limit the authority of banks to conduct closings anymore than that authority was limited by U–31. Thus, they urge us to affirm their authority to conduct closings.

The United States of America, Department of Justice ("Department") has filed an amicus curiae brief in support of Movants. The Department states:

> KBA U–58 likely will cause costs for all Kentucky consumers to rise while providing them no more protection than they currently receive. On the other hand, there is no demonstrated harm from the lay closings that have taken place in Kentucky since the KBA sanctioned the practice in 1981, and less drastic measures than banning lay set-

tlements are available if additional consumer protections are required.

Essentially, the Department argues that the interests of the public are best served by keeping open the option of selecting a lay closing agent. In this way, competition is encouraged, thus, keeping prices low and services comparable. Further, the Department claims that the Board of Governors failed to identify any actual harm that has resulted to consumers because of the procedures in effect prior to U–58. Accordingly it states, "U–58 completely fails to provide consumers with any more protection than they currently have while enjoying the benefits—namely, lower prices—of lay closings." Thus, it urges us to vacate U–58.

The KBA, of course, represents the interests of real estate attorneys across the state. It stands by the opinions expressed in U–58 and contends that these opinions are perfectly consistent with U–31. The KBA denies that U–58 was motivated by any ill feelings from the real estate bar against title companies and the competition they bring. Instead, it asserts that U–58 was motivated by a concern that the public is being harmed by lay closing agents' practice of law. The KBA contends that real estate closings are the practice of law because they involve legal rights and abound with legal issues. The KBA maintains that despite the wording of U–31, lay closers do not refrain from answering legal questions at closings and that they often give incorrect answers. It vehemently argues that the public is injured by the practices of lay closers because these closers are not subject to the same stringent disciplinary actions and malpractice claims that 'attorneys could face. The KBA denies that the price decreases seen in the fees charged by lawyers for closings are attributable to increased competition by title companies, and, instead, maintains that these price reductions are a product of consumer demand. Finally, the KBA argues that U–58 is compatible with the treatment of lay closings by the highest courts in many other jurisdictions, including Virginia, South Carolina, and New Jersey. Thus, the KBA urges us to affirm U–58 as a balanced approach to the underlying goal of protecting the public.

In response to Movants' motions, the KBA requested an opportunity to produce evidence for our review. We granted that request, and sixteen depositions were taken and more than 1000 pages of exhibits tendered.

The KBA deposed eight individuals: (1) J. David Borders, Louisville real estate attorney; (2) Daniel T. Mistler, Covington real estate attorney and author of the draft opinion that was submitted to the KBA's Unauthorized Practice Committee; (3) Jason C. Vaughn, Louisville real estate attorney; (4) Marcus Carey, chair of the Kentucky Bar Association's Unauthorized Practice of Law Committee; (5) Thomas Todd, Lexington real estate attorney and member of the ad hoc committee that submitted draft opinions to the Unauthorized Practice Committee; (6) Burton A. Washburn, III, Paducah real estate attorney and member of the ad hoc committee; (7) James Crayton Clay, Lexington real estate attorney; and (8) Mark D. Rucker, Lexington real estate attorney and sole owner of First Commonwealth Title. Nearly all of these witnesses testified: (1) that a real estate closing involves more than just signing documents; (2) that legal questions arise at nearly every closing; (3) that lay closers are generally incompetent to perform closings in a way that adequately protects consumers; (4) that lawyers' fees for closings are comparable to or less than fees charged by title companies; (5) that lay closers solicit clients in ways that are

unethical for attorneys; and/or (6) that lawyers are much more accountable to consumers because of the malpractice claims and disciplinary actions that can be pursued against them. Many of these same witnesses admitted: (1) that lawyers representing lenders often answer legal questions asked by buyers and sellers, sometimes giving legal advice or counsel; (2) that some lawyers permit their lay staff to conduct closings; and (3) that at least some buyers incorrectly perceive lenders' attorneys to be guarding their interests. The exhibits tendered by the KBA consisted primarily of sample settlement statements, indicating the various closing fees charged by attorneys and title agents, minutes from several KBA Unauthorized Practice Committee meetings, and samples of closing documents. The KBA's exhibits also contained an advertisement from one title company that offered incentives for referrals and several samples of erroneously prepared closing documents.

KLTA took seven depositions in this matter: (1) Carolyn S. Bratt, Professor of Law at the University of Kentucky; (2) Norman Jones, Jr., real estate agent and appraiser; (3) James R. Maher, attorney and manager of the American Land Title Association; (4) Joseph A. Ledford, area sales manager for PNC mortgage; (5) Richard W. McCarthy, Director of Research for the American Land Title Association; (6) Jay A. Rosenberg, attorney; and (7) Clint McKinley, President and Co-General Counsel for Southeastern Title Company and President of KLTA. Countrywide and LandSafe deposed Colleen Russell, a compliance officer at LandSafe. The witnesses deposed by Movants testified generally that: (1) lay closing agents are competent to perform closings; (2) closings are ministerial or administrative in nature; (3) lay closing agents are trained not to answer legal questions and in practice, do not attempt to do so; (4)

national title insurers require title agents to carry errors and omissions policies; (5) owners title insurance is offered to residential buyers; (6) closing documents are standardized and are generally prepared by the lender; and (7) legal questions rarely arise at closings. Some of the witnesses admitted to soliciting clients through incentive advertising and personal visits. The exhibits tendered by the Movants included: (1) a training manual for lay closing agents; (2) sample closing documents; and (3) sample closing instructions.

## IV. ANALYSIS

### A. REVIEW OF THE EVIDENTIARY RECORD

From the evidence, we have identified six major issues relating to: (1) the origination of U–58; (2) the nature of a real estate closing; (3) the types of changes, if any, that the advent of the secondary mortgage market has had upon real estate transactions; (4) the types of questions that arise at closings; (5) closing fees; and (6) professional accountability. We will address each issue in turn.

Marcus Carey was the primary witness regarding the creation of U–58, but several of the attorneys who were part of the ad hoc committee that drafted the initial opinion also testified to their role in its creation. Daniel T. Mistler offered some insight into how the issue got to the Unauthorized Practice Committee. He acknowledged that he had approached the KBA in the early 1990s seeking an opinion on whether a law firm could properly open a title company. He received no response for many years. Then, in 1997 an attorney contacted him and advised him that a group of attorneys from Louisville was seeking the same type of opinion from the KBA. Mistler joined that group at an informational meeting of the Unauthorized

Practice Committee in Frankfort. He actually authored the nine or more drafts that the ad hoc committee eventually produced.

Mistler and other witnesses who were part of the ad hoc committee testified that their work on the committee was motivated, at least in part, by their concerns that lay closers, specifically title companies, were unregulated and untrained as to the legal issues involved in residential real estate closings. The testimony revealed, however, that this was not the committee's only motivation. Specifically, the witnesses representing the real estate bar indicated their distaste for title companies and the competition they bring. In particular, several of the witnesses discussed the business inequities that result from allowing title companies to solicit business in ways that are improper for attorneys who offer the same services. Of course, this distaste of competition cannot be ascribed as the sole motivation behind U–58, but the fact that it was a significant motivation must be considered and reflected in our decision.

The witnesses offered differing perspectives as to which events in the real estate transaction constitute a "real estate closing." The KBA's witnesses portrayed the closing as a long, complicated process involving much more than just the signing of documents and the transfer of funds. Thomas Todd, for instance, remarked

> I consider everything we do from the time we get the order in, from the time we run the title, to the time we prepare the closing documents, to the time we send the checks out the door to pay off all the lienholders and follow up on releases in a timely fashion on those lienholders, I consider that all to be part and parcel of the closing.

Another KBA witness, Burton Washburn, described the first step in the real estate closing as the issuance of a title insurance commitment or checking for insurable title. J. David Borders offered an even broader description of the closing:

> [I]t's always been my policy that a real estate transaction takes place long before the parties sit down to the actual closing. A real estate closing actually— or real estate transaction or closing, as far as I'm concerned, goes from the time I actually receive the contract or the title order and goes through the time of the actual closing, and sometimes even past the actual closing if there's problems that arise after the closing.

The KBA has, in fact, gone to great lengths to try to suggest that the closing is more than the final transaction that occurs around the closing table. This excerpt from Mistler's testimony exemplifies their efforts:

Q: Let's speak for a moment about what it means to conduct a closing. In your view does a closing begin only at the moment that a group of people enter the room to execute the documents?

A: It's like an iceberg. All of the work is underneath it. All the bulk is underneath it. The closing is the most visible part of any transaction, but it's certainly not the most work.

Q: When you as an attorney conduct the closing, does your work in conducting that closing begin with a review of the documents that have been generated from your computer systems or prepared by support personnel as the documents to be used and executed by the parties in that closing?

A: Yes. I review, a lawyer reviews every title exam. I review, or my assistants review every closing package before it goes to closing.

Q: And based on your experience in these matters, is it possible for someone to conduct a closing by simply stepping into a room and pointing at the signature lines for people to sign?

A: Well, it's possible because I see that being done.

Q: By lawyers?

A: Not always, no.

Q: By lay closers?

A: Uh-huh.

Q: But does that constitute the conduct of a closing, or is that merely the administration of a signature event?

A: This would be conducting the full closing. This would be like if we're attending the closing, the lay person typically sitting at the head of the table conducting it, and that may be the first time that person sees the file.

Apparently not satisfied that he had received the answer for which he had been searching, Bar Counsel Ben Cowgill rephrased his question:

Q. I guess I'm not asking my question clearly. Based on your experience, does that constitute proper conduct of a closing, to merely step in the room and pass out the papers?

A. No. I do not believe it is proper conduct.

Of course, it comes as no surprise that Mistler believes that a ministerial closing presided over by a lay closing agent is improper. He did, after all, draft the advisory opinion that was originally submitted to the KBA's Unauthorized Practice Committee. Mistler's testimony, however, contains two interesting points. First, Mistler concedes that he has observed *attorneys* conduct closings in the "point-and-sign"

manner that he believes to be improper. Second, despite Mr. Cowgill's attempts to elicit otherwise, Mistler confirmed that, in his view, "the closing" consists solely of the gathering of the parties for finalizing the transaction, i.e., signing documents, dispersing funds. Further, most witnesses, even those who defined a closing as more than the final event in the real estate transaction, recognized that this final event, which typically takes less than an hour to complete, is commonly understood to be "the closing."

Those additional steps are unquestionably part of the real estate *transaction;* they are not, however, part of the real estate *closing* that U–58 contemplates. U–58 provides that "[t]he 'conduct' of a closing is the culmination of [the sale and loan or secured loan transactions resulting in the transfer of an interest in real estate]." As described by Professor Bratt, the closing is "that very thin slice in a continuum that starts with a listing agreement and usually ends with the closing, that it's that little sliver at the end where the parties come into the room, sit around the table, they execute and exchange the necessary documents and money to complete the transaction." This view is compatible with our understanding of the real estate closing—"the final steps of the transaction whereat the consideration is paid, mortgage is secured, deed is delivered or placed in escrow, etc"[9]—or, as the New Jersey Supreme Court described the occasion:

The day for closing arrives and everyone meets, usually at the offices of the title company. Seller and buyer are there, each without an attorney; the broker is there, and the title officer is there, representing both the title company and the mortgagee. The funds are there. And the critical legal documents

9. Black's Law Dictionary 255 (6th ed.1990).

are also on hand: the mortgage and the note, usually prepared by the mortgagee; the deed, along with the affidavit of title, prepared by the attorney selected by the broker or by the title company; the settlement statement, usually prepared by the title company, indicating how much is owed, what deductions should be made for taxes and other costs and what credits are due; and the final marked-up title binder, which evidences the obligation of the title company to issue a title policy to the buyer, and which at that point is probably practically meaningless to the buyer. All are executed and delivered, along with other documents, and the funds are delivered or held in escrow until the title company arranges to pay off prior mortgages and liens.

... [T]he deal closes, satisfactory to buyer and seller in practically all cases, satisfactory both at the closing and thereafter.[10]

We understand Kentucky real estate closings to occur in much the same fashion. Thus, in defining the operational terms, we accept that the closing is, in fact, that "final event" where the parties gather around a table to complete their transaction by signing and exchanging documents and transferring funds.

Nearly every witness testified that there have been significant changes in the way real estate transactions are conducted over the last twenty years and most if not all of the witnesses attributed these changes primarily to technological advances and the advent of the secondary mortgage market. They dispute, however, the effect that these changes have had on real estate closings. All agree that the pile of documents required at the closing has grown significantly as a result of the stringent requirements for resale of mortgages on the secondary market. Further, all agree that these documents are, in general, more standardized than they were prior to the secondary market. Specifically, Joseph A. Ledford testified that as many as 95% of all documents are the same at closings. Most witnesses admitted that there is little or no possibility of negotiating the terms of these documents with the lender; instead, acceptance of the terms is a "take it or leave it" condition to issuance of the loan. James T. Maher described the changes:

I would say certainly before the mid-70s residential real estate transactions, other than in the title insurance policy area, were much more idiosyncratic, if you will. The security interest agreements, certainly before 1970 when the Fannie Mae, Freddie Mac documents first came out, and their uses increased to sort of almost every year, has certainly geometrically increased since the mid-80 time frame that seems to be the focus of these questions.

But I would say that individual lending institutions would typically ... draft their own ... institutionally specific security agreement because in those days, as we've all suggested, the—most lenders were portfolio lenders and these transactions were held in their own portfolios so the form of the security interest was—tended to be highly state specific, highly institutionally idiosyncratic.

Before '75, there was no uniform settlement statement, and a lot of the certifications and mortgage credit related documentation that tends to get executed at a settlement table, was not—either not needed or was unique to each individual lender, and whatever they decid-

---

10. *In Re Opinion No. 26 of the Committee on the Unauthorized Practice of Law,* 139 N.J. 323, 654 A.2d 1344, 1351 (1995) (hereinafter *"In Re Opinion No. 26 "*).

ed was required. Now you have a Fannie Mae or Freddie Mac sellers or guide that dictates most of these forms or the response to them.

Many witnesses, primarily those testifying at the request of the Movants, felt that these changes have decreased the complexity of closings. Others, primarily, mostly those testifying for the KBA, expressed the opposite belief, i.e., that these changes have made real estate closings much more complex than they were in the 1970s. James Crayton Clay, for instance, who follows a routine of explaining closing documents to the parties at the table, believes that real estate transactions have become more complicated because of the secondary market and all of its restrictions and forms. Professor Bratt, however, observes little change in the nature of the transaction: "[I]t was 'point and sign' 20 years ago and it's 'point and sign' today. The only difference is there are more papers that have to be signed today."

We do not criticize Mr. Clay, a highly-skilled real estate attorney, for his thoroughness; however, from our review of the evidence presented, we believe that Professor Bratt more accurately characterizes the vast majority of Kentucky real estate closings today. And, U–31 tells us that real estate closings consisted almost entirely of ministerial duties more than twenty years ago. We believe the changes in the secondary market have had little effect on the essential nature of the closing, itself, except to the extent that those changes have standardized and proliferated the documents at closing. Because most of the closing documents are prepared by the lender and legal issues are almost always resolved prior to the closing, the closing agent's role at the closing table is to present the documents to the parties, to instruct the parties where to sign, and to disburse funds.

Considerable evidence was offered concerning the types of questions that are asked at closings. Movants' witnesses testified to their opinions that virtually no legal questions are asked at closings because, in a properly conducted real estate closing, all legal issues should be resolved before the parties meet at the closing table. The KBA's witnesses, however, testified to their diametrically opposite opinions that hardly any closing occurs without one of the parties asking a question that the closer cannot answer without the exercise of legal skill and expertise. What is abundantly clear from the evidence, however, is that the appendix of "typical questions" attached to U–58 is excessive. Many of the questions listed are similar in that they concern the nature of the estate that will be taken by the buyer, i.e., whether there are covenants, easements, or zoning restrictions involved. Further, of the 28 questions in the list, there was testimony regarding no more than eight of them, and most of the witnesses conceded that questions of the nature of those listed in U–58 are asked, if ever, before closing, when there is time to resolve any problems.

From the evidence, we agree with Movants that few, if any, significant legal questions arise at most residential closings. It is true that several of the KBA witnesses testified that they anticipate these types of questions and therefore, undertake to avoid them by thoroughly explaining all of the documents presented at the closing. This evidence, however, does not demonstrate that these types of questions arise regularly at closings, and the depositions provided widespread evidence of closings where the parties ask no questions. Moreover, the evidence has convinced us that in those few instances where legal questions do arise, lay closing agents are properly trained to answer only if they can do so by

reading from the document itself without providing any additional explanation. If they cannot do so, they are trained to halt the closing so that the parties may seek legal counsel. Thus, the evidence demonstrates that, by and large, lay closers have been following the mandates of U–31.

While the KBA has made great efforts to dispel the belief that U–58 was not motivated by its fear of competition, it focused a significant portion of its evidence on the cost of closing transactions, making unnecessary effort to point out that fees charged by its members are competitive with those of title companies. What the KBA has glossed over is the fact that, before title companies emerged on the scene, its members' rates for such services were significantly higher—in some areas as much as 1% of the loan amount plus additional fees. While KBA witnesses attributed the significant decreases in attorney's closing rates to market conditions, we believe this explanation disingenuous and observe that if this were in fact the case, the KBA likely would not have put so much effort into comparing the rates between its members and title companies. Thus, we believe, if nothing else, the presence of title companies encourages attorneys to work more cost-effectively.

The KBA has consistently maintained that one of the purposes behind U–58 is to protect consumers from unregulated lay closers, who according to the KBA's view have little incentive and no legal requirements to provide honest, efficient service. Mistler described this view:

> We have literally seen title companies change names and continue to work. They don't, if they incorporate and they run into a problem, you know, 3 or $400, they reincorporate. And my exposure is much greater than theirs. I worked too hard for my license to give it up for a closing.

First, we note that Mistler's anecdote was not corroborated by any other witness and was, in fact, denied by at least one. Second, we take issue with the implications of Mistler's statement—that merely because he was able to successfully pursue a law degree and license he is by nature a more honest and ethical person than laypersons who have not made such a commitment. Many witnesses testified that the majority of title companies in this state are owned and operated by attorneys. It is naive to think that were these attorneys to leave a track record of unsatisfied customers and unethical conduct as title company representatives that they could ever successfully return to the practice of law. If nothing else, the injury to their personal reputations would follow them. Thus, they too have great exposure. But, in any event, we recognize that lay closing agents earn their livelihoods from continued business. If they fail to act ethically and professionally, they risk that livelihood.

In addition, regardless of the internal pressures individual attorneys and closing agents face to act ethically and accountably, there are other safeguards in place to protect the public. Although the KBA centered much of its argument on the alleged fact that lay closing agents have no external accountability mechanisms akin to the disciplinary actions and malpractice claims that can be pursued in response to an attorney's misconduct or negligence in real estate transactions, this claim is not supported in the record. The evidence shows that national title insurance underwriters require their agents, whether attorneys or non-attorneys, to carry errors and omissions insurance. And, most of the title industry representatives testified that these same underwriters exercise strict control over their agents by periodically monitoring their use of funds and their competence. Also, nearly every witness

testified that title insurance is available and offered to most homebuyers to protect them against errors in title. More fundamentally, however, we agree with Movants that the nature of our economy is such that incompetent and unethical closing agents, whether attorneys or non-attorneys, will be nudged aside by consumers who will choose the most effective and efficient providers. Finally, we would add that the civil justice system does present a means of ensuring accountability. What we commonly refer to as a "malpractice claim," is nothing more than a legal negligence claim, and lay closing agents are equally subject to common law negligence claims if their negligence results in damages.

## B. LAY CLOSINGS AND UNAUTHORIZED PRACTICE OF LAW

■ We are asked today to decide an issue of first impression in this state. It is an issue of much less breadth than the evidence adduced by the parties would suggest: Is conducting a real estate closing the unauthorized practice of law? Based on our review of the evidence and arguments presented to us, we hold that it is not the unauthorized practice of law for a layperson to conduct a real estate closing for another party. Therefore, we vacate U–58 and adopt the reasoning of U–31.

Our Supreme Court rules define the practice of law as "any service rendered involving legal knowledge or legal advice, whether of representation, counsel or advocacy in or out of court rendered in respect to the rights, duties, obligations, liabilities, or business relations of one requiring the services." [11] The General Assembly has criminalized the unauthorized practice of law, [12] and our disciplinary rules prohibit attorneys from "[a]ssist[ing] a person who is not a member of the bar in the performance of an activity that constitutes the unauthorized practice of law." [13] The rationale for such restrictions is that "limiting the practice of law to members of the bar protects the public against rendition of legal services by unqualified persons." [14]

■ Accordingly, the conduct of a closing is the practice of law if (1) it requires legal knowledge or legal advice, (2) involves representation, counsel or advocacy on behalf of another party, and (3) involves the rights, duties, obligations, liabilities, or business relations of that other party. "[P]racticing law is not confined to performing services in actions or proceedings in courts of justice, but includes giving advice and preparing wills, contracts, deeds, mortgages, and other in-

11. SCR 3.020.

12. KRS 524.130:
   (1) Except as provided in KRS 341.470 and subsection (2) of this section, a person is guilty of unlawful practice of law when, without a license issued by the Supreme Court, he engages in the practice of law, as defined by rule of the Supreme Court.
   (2) A licensed nonresident attorney in good standing, although not licensed in Kentucky, is not guilty of unlawful practice if, in accordance with rules adopted by the Supreme Court, he practices law under specific authorization of a court.

   (3) Unlawful practice of law is a Class B misdemeanor.

13. SCR 3.130 (Rule 5.5(b)). *See also Adams v. Kentucky Bar Association*, Ky., 843 S.W.2d 898 (1993).

14. SCR 3.130 (Rule 5.5, comment). *Cf. Frazee v. Citizens Fidelity Bank & Trust Co.*, Ky., 393 S.W.2d 778, 782 (1964) ("The basic consideration in suits involving unauthorized practice of law is the public interest. Public interest dictates that the judiciary protect the public from the incompetent, the untrained, and the unscrupulous in the practice of law.").

struments of a legal nature." [15] Thus, we have declared that making title examinations,[16] invoking the jurisdiction of the county probate court through pleadings or appearances,[17] and preparing real estate mortgages [18] constitute the practice of law. The question now before us, however, concerns the events at a real estate closing, which we earlier characterized as the "final event" of the real estate transaction where the parties execute documents and funds transfer hands.

The KBA recognized in U–31 and in U–58 that there are many ministerial acts that transpire at a real estate closing, including handling financial matters, payments, and loan insurance. Clearly none of these "ministerial" acts requires legal knowledge or advice and, therefore, cannot be termed the practice of law. Other closing events, such as directing a party where to sign a particular document or delivering copies of the signed documents, are equally ministerial in nature. The dispute arises with regard to one issue—the potential for legal questions and issues to arise at the closing. The KBA argues that this potential renders any conduct at the real estate closing by a person not a party to the transaction the unauthorized practice of law. We disagree.

In our view, U–58 rests on several faulty assumptions. The first is that "it is unrealistic and naive to assume that ... the settlement agent can present important legal documents to the seller, buyer, borrower, and/or lender at a closing without legal questions being asked and without giving legal advice." This statement is a broad overgeneralization, and the evidence described above has exposed its inaccuracy by illustrating that many closings occur without even one question being asked. And, even when questions are asked, most of them concern the financial terms of the mortgage and not the legal consequences of the transfer of property. Further, the undisputed evidence was that title companies train their employees that, if a question cannot be answered by reading the face of the document or by offering a blackletter description, the closing agent is to: (1) explain to the questioning party that he or she should seek legal counsel for an answer to their question; and (2) stop the closing until the party has had an opportunity to seek legal advice and is ready to continue.

The KBA contends that even if this evidence is true, as we accept it is, this is insufficient because "[i]f a problem arises during the closing and there is no attorney-client relationship, the parties are without the benefit of independent counsel and may lack the leverage or will to halt a transaction that is not in their best interests." This is U–58's second faulty presumption. We fail to see how this risk is any different under the KBA's requirement that an attorney conduct or at least supervise the closing than it is if a layperson performs the closing. As the evidence revealed, the attorney almost invariably works for the lender, and, therefore, the only attorney-client relationship in the typical KBA approved closing is between the

**15.** *Howton v. Morrow*, 269 Ky. 1, 106 S.W.2d 81, 82, (1937).

**16.** *See Kentucky Bar Association v. First Federal Savings & Loan Association*, Ky., 342 S.W.2d 397, 398 (1960).

**17.** *Frazee v. Citizens Fidelity Bank & Trust Co., supra* note 14 at 782.

**18.** *Kentucky Bar Association v. Tussey*, Ky., 476 S.W.2d 177, 180–81 (1972). *See also Federal Intermediate Credit Bank v. Kentucky Bar Association*, Ky., 540 S.W.2d 14, 15 (1976) (" 'It is well settled that preparation of mortgages is the practice of law.' ").

attorney and the lender. This relationship offers no greater protection to the best interests of either the buyer or the seller. The KBA argues that under *Seigle v. Jasper*,[19] the interests of the buyer or the seller are protected. We agree that *Seigle* protects these parties from negligent acts by the attorney with regard to the title search.[20] It does not, however, necessarily assure the buyer and seller, who are not the attorney's clients, the benefit of independent legal counsel with regard to legal issues separate and apart from the title search, i.e., the sales contract, the terms of the mortgage, the title insurance policy. Yet, the evidence showed that many buyers often assume that the lender's lawyer represents their interests. The only way to ensure this benefit of independent counsel that the KBA considers so important is to require all parties to the transaction to obtain their own counsel. Although we recognize that persons with the financial wherewithal to do so may wish to retain independent counsel for a real estate closing, we also recognize that for us to require parties to have independent counsel would substantially increase the transactional costs associated with a home purchase and thus run contrary to the public's interest.

In a similar statement, U–58 provides that "[t]he legal questions present at a closing, whether asked or should be asked, are endless ...." This statement implies that attorneys must conduct or at least supervise closings because there are questions that should be asked at real estate closings that are not asked and having an attorney present will somehow ensure that these questions are asked and answered. Again we fail to see how requiring attorneys to conduct or supervise real estate closings will meet this perceived need. Only a few of the attorneys testified that they explain the closing documents to the parties in such detail that there could be few if any unanswered questions. The remainder indicated that they conducted the closings by identifying the documents, directing the placement of signatures, and answering questions asked by the parties. Because lay closing agents conduct closings in a nearly identical fashion, the supervision or even presence of an attorney at the closing offers no more protection to the parties with regard to their unasked questions.

U–58 also states that "questions of legal rights and duties are always involved [in real estate closings], and there is no way of assuring that lay settlement agents would raise, or would not attempt to answer, the legal questions." The KBA has argued that because lay closing agents are not susceptible to the same disciplinary sanctions as lawyers, they have no obligations or incentive to conduct their services in any but their own best interests. We do not agree with the KBA's efforts to paint title agents in such a negative light, especially since the evidence has revealed that their services are comparable to those provided by attorneys. Further, the simple fact that title agents must compete with licensed attorneys for closing business gives them incentive to behave in a manner similar to that required of attorneys. And, despite the KBA's contentions, mechanisms exist to ensure title agents' accountability. First, as the KBA recognized in U–58, lay closing agents owe duties to the parties as imposed by agency and tort law.[21] Second, lay closing agents

---

19. *Seigle v. Jasper,* Ky., 867 S.W.2d 476 (1993).

20. *Id.* at 482.

21. There was much attention paid in the evidence to whether certain witnesses believed that the duty announced in *Seigle v. Jasper,* extends to layperson closing agents. The is-

who actually answer legal questions or encourage parties to continue with a closing in the face of significant legal issues—i.e., those who *actually engage in the practice of law*—can be criminally sanctioned for the unauthorized practice of law.[22]

In addition to its inaccurate premises, U–58 suffers from internal inconsistency in that it first concludes that real estate closings must be presided over or supervised by a licensed attorney because they inherently involve the practice of law, but then carves out an exception for institutional lenders. Essentially, U–58 states that lenders' lay employees can conduct closings when their employers provide lender services connected with the real estate transfer. However, it restricts these employees from rendering legal advice or answering legal questions, a concession it believed would be insufficient to allow title companies to perform closings. Thus, U–58 either (1) authorizes lay corporate employees to practice law, which we have prohibited,[23] or (2) applies an impermissible double standard with its discriminating definition of the practice of law, which is equally unpalatable.

Finally, the KBA insists that U–31 and U–58 can coexist without conflict. We fail to see any logic in this argument. In its very first line, U–31 recognizes that it is concerned with the activities of real estate mortgage lenders and title insurance companies. Quickly its text goes on to permit lay real estate closings by these groups. The opinion provides:

> A "real estate closing" is at best ministerial in nature. Some lawyers allow

secretaries and paralegals to participate in closings. The closing, which consists mainly of financial matters, payments, schedules of payment, and insurance, is basically a nonlegal function. So long as the lay person avoids the giving of legal advice, there is no problem with a lay employee closing a real estate transaction. The rub which frequently arises in a real estate closing situation is that often questions of a legal nature are posed to the layman who is closing the transaction. Any response would constitute legal advice and would be the unauthorized practice of law by the person answering the questions. In such an instance, the lay person should discontinue the closing and seek proper legal advice. It should be observed that many Federal loans involve significant knowledge of the law, and questions as to what is meant in the documents would certainly involve the unauthorized practice of law.[24]

U–58, however, explicitly denies that title companies can perform real estate closings without engaging in the unauthorized practice of law when it states that "[a] title agency may not conduct real estate closings or mask legal fees for closing services under the guise of a 'settlement fee' or other charge. Their conduct of a closing absent independent legal counsel constitutes the unauthorized practice of law." With both of these opinions in force, it is impossible for lay closing agents—in particular title companies—to determine what conduct in which they may lawfully en-

---

sue is not one that is before us, and we will not consider it at this time.

**22.** *See supra* note 12.

**23.** *See, e.g., Kentucky Bar Association v. Tussey, supra* note 18 at 180 ("We say here only that a layman may not enter into the practice of law through becoming an officer or em-

ploye[e] of a corporate client."); *Kentucky Bar Association v. First Federal Savings & Loan, supra* note 16 at 399 ("A corporation ... may not itself engage in the practice of law.").

**24.** KBA U–31.

gage. The KBA has not shown any changes or injuries to consumers that would warrant such wholesale change from U–31. And as we have said before, "if it ain't broke, don't fix it." [25]

In a similar case, *Frazee v. Citizens Fidelity Bank & Trust Co.*,[26] we declared that a bank or trust company that invoked "the jurisdiction of the county probate court through pleadings or appearances" was engaged in the unauthorized practice of law. In doing so, we offered some guidance to banks and trust companies about how they could effectively operate their businesses without inadvertently practicing law. We wrote:

> In all legal questions which may arise in the development of trust business, the trust institution shall advise the customer to confer with a lawyer of his own choosing.
>
> The trust institution shall respect and not interfere with the professional relationship existing between an attorney and his client, and an attorney shall respect and not interfere with the business relationship existing between a trust institution and its customer. It is recognized, however, that in all cases the interest of the client is paramount. An attorney shall not seek to displace the institution of the client's choice by inducing the appointment of some other institution or individual unless the client's affairs demand services peculiar to some particular institution or individual, or unless it appears that the true interest of the client will suffer if such substitution is not made.
>
> If the trust institution is requested by its customer to recommend counsel, any

counsel so recommended shall be in a position to advise the customer disinterestedly, and it is preferable that the trust institution, when making such recommendations of counsel to its customer, submit, without recommending one above another, the names of several attorneys in whom it has confidence, leaving the choice of the selection to the customer.

> A trust institution, qualified and authorized by law as a legitimate business enterprise, has an inherent right to advertise its trust services in appropriate ways. It shall not, directly or indirectly, offer to give legal advice or render legal services, and there shall be no invitation to the public, either direct or by interference in such advertisement, to bring their legal problems to the trust institution. Its advertisement shall be dignified and the qualifications of the institution shall not be overstated or overemphasized, and it shall not be implied in any advertisement that the services of a lawyer are only secondary or ministerial, or that by the employment of the services of the trust institution, the employment of counsel to advise the customer is unnecessary.[27]

We think this sound and fair guidance that, if followed, offers substantial protection to consumers. Today we offer this guidance to those laypersons who perform closings, but we recognize as we did in *Frazee* that this advice does not mean that an attorney is required in every instance, but only where it is necessary to render legal services in connection with the transaction.[28]

**25.** *American Insurance Association v. Kentucky Bar Association*, Ky., 917 S.W.2d 568, 571 (1996) (upholding fifteen year old KBA unauthorized practice opinion).

**26.** *Supra* note 14.

**27.** *Id.* at 783–84.

**28.** *Id.* at 786.

Both sides spent a significant portion of their briefs discussing the law in other states with regard to lay closings. In particular, the KBA has drawn our attention to three states—Virginia, New Jersey, and South Carolina—in its insistence that lay closings are the unauthorized practice of law. After reviewing the law in these states, we are confident that the KBA's position is incorrect under Kentucky law.

In Virginia, lay closings are permitted by statute.[29] However, before the Virginia legislation was adopted, the Virginia Supreme Court approved a Virginia Bar Association Opinion on the Unauthorized Practice of Law that declared lay closings to be the unauthorized practice of law. While this opinion no longer carries any force in that state because it was preempted by legislation, much of the text of U–58 was inspired by it. Therefore, we will address it briefly.

In declaring lay closings to be the unauthorized practice of law, the Virginia Supreme Court stated its belief that "[t]he real estate closing ... when viewed in its entirety, is an undertaking which requires the application of legal skill, knowledge, and principles to a particular situation." The evidence in this case has led us to believe that the same is not true for real estate closings in Kentucky. For instance, the Virginia court noted the following concerning conduct at a closing:

> We believe, for example, the contract of sale must be reviewed and interpreted to determine whether all the conditions expressed therein have been met. Where a survey has been ordered, a determination must be made of whether the legal description and the plat are compatible; and the plat must be re-viewed and interpreted to determine whether encumbrances not allowed by the terms of the contract, or by covenants or restrictions, are disclosed by the plat. A title opinion or title insurance policy must be reviewed and interpreted in order to inform the purchaser of its meaning and potential risks, as well as the effect of covenants, conditions, restrictions, encumbrances and other matters set forth in the opinion or policy. A person responsible for a closing must be able to interpret and evaluate the terms of a loan commitment and accompanying documents to determine whether they conform to the contract and whether they comply with applicable federal and state laws or regulations.[30]

Yet these activities, which in part led the Virginia court to conclude that lay closings are the unauthorized practice of law, are not part of the closing in Kentucky as we understand it. Instead, in the properly conducted closing, these events would occur and issues about them would be resolved before the parties ever meet at the closing table.

In *In re Opinion No. 26 of the Committee on the Unauthorized Practice of Law*,[31] the Supreme Court of New Jersey ruled that real estate transactions involve the practice of law, but authorized the practice nonetheless. The New Jersey court had the unique opportunity to evaluate distinct regions of the state—North Jersey, where nearly every buyer and seller in residential real estate transactions was represented by counsel, and South Jersey, where almost no buyers or sellers were represented by counsel at any time during the transaction. In concluding that the con-

---

**29.** *See,* Virginia Consumer Real Estate Settlement Protection Act, Va.Code §§ 6.1–2.19 *et seq.,* Virginia Real Estate Settlement Agent Registration Act, Va.Code §§ 6.1–2.30 *et seq.*

**30.** Va. UPL Opinion # 183 (Oct. 17, 1996).

**31.** *Supra* note 10.

duct of a real estate transaction was the practice of law, the court noted:

> [T]his transaction in its entirety, the sale of real estate, especially real estate with a home on it, is one that cannot be handled competently except by those trained in the law. The most important parts of it, without which it could not be accomplished are quintessentially the practice of law. The contract of sale, the obligations of the contract, the ordering of a title search, the analysis of the search, the significance of the title search, the quality of title, the risks that surround both the contract and the title, the extent of those risks, the probability of damage, the obligation to close or not to close, the closing itself, the settlement, the documents there exchanged, each and every one of these, to be properly understood must be explained by an attorney. And the documents themselves to be properly drafted, must be drafted by an attorney. Mixed in with these activities are many others that clearly do not require an attorney's knowledge, such as the ordering of inspection and other reports, and the price negotiation. But after that, even though arguably much can be accomplished by others, practically all else, to be done with full understanding, requires the advice of counsel.[32]

Our decision today differs significantly from the one made by the New Jersey court in that we are concerned only with the real estate closing, not with the entire real estate transaction. While the New Jersey court did include the actual closing as one of the many events that it deemed required legal knowledge, its decision focused on the entirety of the real estate transaction, and it is difficult to discern

what it was, exactly, that led the court to believe that a real estate closing alone would constitute the practice of law. Regardless, we agree with the New Jersey court that many parts of the real estate transaction involve the practice of law. The closing, however, is not one of these when it is conducted without the giving of legal advice or counsel.

The KBA also relies heavily on South Carolina's decision not to allow lay real estate closings. In *South Carolina v. Buyers Service Company,*[33] the Supreme Court of South Carolina reversed a lower appellate decision permitting a commercial title company to conduct real estate closings, provided that it gave no legal advice. Agreeing in theory with the Court of Appeals, the Supreme Court stated, "there is in practice no way of assuring that laypersons conducting a closing will adhere to the restrictions. One handling a closing might easily be tempted to offer a few words of explanation, however innocent, rather than risk losing a fee for his or her employer."[34] As we have already indicated, the evidence revealed that this is not a frequent occurrence at lay closings in Kentucky. Further, we believe that criminal sanctions for the unauthorized practice of law imposed on layperson agents who answer legal questions and provide legal guidance provide adequate incentive for lay closers to refrain from these prohibited acts.

We do not deny that there are some portions of the residential real estate transaction that do constitute the practice of law, i.e., the title commitment letter and the preparation of deeds and mortgages, but this case has not asked us to deal with those matters attendant to the real estate closing itself. What we have been con-

**32.** *Id.* at 339, 654 A.2d at 1351–52.

**33.** 292 S.C. 426, 357 S.E.2d 15 (1987).

**34.** *Id.* at 19.

cerned with today is merely the thin slice at the end of the real estate transaction that we refer to as the closing. Certainly, we do not doubt that legal issues arise at some real estate closings. We do not, however, believe that the rate at which these issues arise requires that only attorneys or persons under their immediate supervision conduct real estate closings. Stated otherwise, although a layperson may not dispense legal advice *anywhere*—not on the golf course, not in line at the grocery, not while fishing on a lake somewhere, and certainly not at a real estate closing—we do not believe that a real estate closing is a setting so fraught with the potential for unauthorized practice that U–58's blanket prohibition against lay closing agents is warranted as a prophylactic measure. Thus, we vacate U–58. In doing so, we recognize that U–31 properly states the law on real estate closings in Kentucky: laypersons may conduct real estate closings on behalf of other parties, but they may not answer legal questions that arise at the closing or offer any legal advice to the parties. If they do answer such questions, they are then engaged in the unauthorized practice of law.

## V. CONCLUSION

For the above reasons, we hereby vacate U–58 and hold that U–31 accurately describes the unauthorized practice of law parameters for real estate closings conducted by non-lawyers.

All concur.