**Supreme Court**

In re William E. Paplauskas, Jr.      :      No. 2018-161-M.P.

In re Daniel S. Balkun and Balkun Title &      :      No. 2018-162-M.P.
Closing, Inc.

In re SouthCoast Title and Escrow, Inc.      :      No. 2018-163-M.P.

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re William E. Paplauskas, Jr.  :  No. 2018-161-M.P.


In re Daniel S. Balkun and Balkun Title &  :  No. 2018-162-M.P.
        Closing, Inc.


In re SouthCoast Title and Escrow, Inc.  :  No. 2018-163-M.P.


Present:  Suttell, C.J., Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**PER CURIAM.**  We are called upon to opine as to what functions involved in a real estate closing may be performed by non-attorneys and which, if any, require the efforts of an attorney licensed to practice law in this state.  We wish to emphasize at the outset our firm belief that parties to a real estate transaction are best served if they are represented by licensed attorneys.  In our judgment, allowing such transactions to be conducted by non-attorneys exposes sellers, and especially buyers, to the possibility of harm that outweighs the one-time savings that a party might realize as a result of not having to pay a fee charged by an attorney.  In our view, pursuing such a course of action is fraught with peril.  However, that is not the question before us.  What is before us is whether a non-attorney who performs one or more of the various services that are associated with a real estate transaction is thereby engaging in the unauthorized practice of law.

This Court has long held that "the practice of the law is a special field reserved to lawyers duly licensed by the [C]ourt." *In re Town of Little Compton*, 37 A.3d 85, 85 (R.I. 2012) (deletion omitted) (quoting *Rhode Island Bar Association v. Automobile Service Association*, 55 R.I. 122, 126, 179 A. 139, 140 (1935)).  We have acknowledged that, at times, the practice of law can be

difficult to define, especially in light of "the changing nature of the legal profession and the lightning speed with which these changes have occurred." *Id.* at 86 (quoting *In re Law Offices of James Sokolove, LLC*, 986 A.2d 997, 1005 (R.I. 2010)). However, when called upon to "feel for the contours of this elusive definition[,]" we remain cognizant that our goal is to ensure "that the public welfare will be served and promoted." *Id.* at 85, 86 (second quotation quoting *Rhode Island Bar Association*, 55 R.I. at 131, 179 A. at 143). In pursuing that goal, our intent is to promote the proper administration of justice by preventing the "great and irreparable injury [that] can come to the people" from "the unwarranted intrusion of unauthorized and unskilled persons into the practice of law." *Id.* at 85 (brackets omitted) (quoting *Rhode Island Bar Association*, 55 R.I. at 131, 179 A. at 143). Such is the nature of the cases before us.

The Unauthorized Practice of Law Committee (the Committee) has transmitted three reports to this Court concerning three separate matters pursuant to Rule 7(c)(ii)(p) of the Committee's Rules of Procedure. In those reports, the Committee concluded that William Paplauskas, Jr., Daniel S. Balkun, Balkun Title & Closing, Inc., and SouthCoast Title and Escrow, Inc. (collectively Respondents) each had engaged in the unauthorized practice of law. The Committee found that the Respondents had engaged in several aspects of residential real estate transactions which, in the Committee's view, constitute the practice of law. The Committee recommended that this Court declare the following activities to be the practice of law: (1) conducting a residential real estate closing; (2) examining a title for marketability; (3) drafting a deed; (4) drafting a residency affidavit; and (5) drafting a durable power of attorney. After receiving the reports from the Committee, we invited the Committee, the Attorney General, the Rhode Island Bar Association, and any other interested parties to file briefs as amici curiae

addressing each of these issues.[1]  We held oral argument concerning these matters on December 5, 2019.  Subsequent to oral argument, we have determined that these matters raise similar issues and should be consolidated.

After thoroughly reviewing the record and considering the arguments of the Committee and the amici, we have decided to decline to adopt the Committee's recommendations in part and to accept them in part.  We hold that title insurance companies and their agents do not engage in the unauthorized practice of law when they: (1) conduct a residential real estate closing; (2) draft a residency affidavit; and (3) draft a limited durable power of attorney, so long as those activities are carried out in connection with the issuance of title insurance.  On the other hand, we have concluded that, with respect to conducting the examination of title for marketability, a title insurance company may do so only if a licensed attorney engaged or employed by the title insurance company conducts the examination.  Further, we adopt the Committee's recommendation that drafting a deed constitutes the practice of law and thus an attorney is required to either draft the deed or review it after it has been prepared.

Despite our disagreement with some of the Committee's recommendations, we take this opportunity to express our profound gratitude to the Committee for their diligent and conscientious efforts on behalf of the public.[2]

---

[1] We acknowledge with gratitude the well-written and thought-provoking amicus briefs that were filed in this case.  We found each of the amicus briefs to be helpful in our analysis of the issues before us.

[2] We also wish to take the opportunity to express our appreciation to those Committee members who dissented in the *Paplauskas* matter for their enlightening counter-arguments on these complex questions.

# I

## Facts and Travel

The Committee issued three separate reports concerning the unauthorized practice of law as it relates to each of the Respondents. In those reports, the Committee set forth well over 200 findings of fact. We rely primarily on those findings of fact, about which there seems to be little, if any, dispute.

## A

### *In re Paplauskas*

In July 2015, Vincent and Rebecca Majewski (the buyers) purchased real property located at 528 Nanaquaket Road in Tiverton, Rhode Island, from Earl Pooler and Nina Szulewski-Pooler (the sellers). The sellers of the property were represented by Attorney John A. Pagliarini, Jr., and his then-associate, Attorney Hailey Munns.[3] Prior to the closing, the buyers' lender, JPMorgan Chase Bank, N.A., engaged an entity known as ServiceLink to act as a settlement agent for the transaction; ServiceLink also issued the title insurance policy to the buyers.[4] ServiceLink then engaged Paplauskas, a notary public, to conduct the closing. Paplauskas, who has been involved in the mortgage industry since 1969, described himself as a freelance "notary public mortgage closer" and stated that he is generally hired "by title companies and other signing agencies" to conduct real estate closings in Rhode Island. Paplauskas said that he was not an employee of ServiceLink, but rather was hired by ServiceLink as an independent contractor.

---

[3] At the time of the closing, Attorney Munns was known by her maiden surname, Conn. For clarity, we refer to her by her current surname, Munns.

[4] Paplauskas described ServiceLink as a title company that performs "title searches, closing, [and] appraisals." ServiceLink acted as a "settlement agent," which we understand to be an industry term that refers to a party who coordinates various tasks in connection with the conveyance of real estate.

Thereafter, an employee of ServiceLink emailed Paplauskas copies of the various closing documents that ServiceLink wished to have executed at the closing. Paplauskas printed two copies of the closing documents, one for execution at the closing and one for the buyers to retain for their personal records. Paplauskas understood his role in the closing to be that of an "impartial witness * * * there to make sure that the person signs the documents, has some understanding of what he is doing, and is the person that's in front of [him]."

On July 21, 2015, the real estate closing at issue was conducted in a conference room at Attorney Pagliarini's law office in Tiverton. The only parties present during the closing were the buyers, Attorney Munns on behalf of the sellers, and Paplauskas. Attorney Pagliarini was on the premises, but he never entered the conference room. Paplauskas testified that, at the start of the closing, he presented a one-page document to the buyers entitled "Notary Held Harmless." He testified that he brought that document to the closing on his own initiative and did so because he wanted the parties to know what his role would be at the closing; he said that he wanted to inform them that he was not holding himself out as an attorney or loan officer and that, if they had any technical questions, they should contact the processor at the lending company. The buyers each signed the document.

Next, Paplauskas testified that he presented twenty closing documents to the buyers. He testified that he identified each document, presented it to the buyers, gave them a brief "overview" of each document, and asked them to review and sign each. He testified that the buyers did not ask him any specific questions and that he did not provide them with any opinion regarding any of the closing documents. He further testified that his overview consisted of his merely indicating the name and terms of each document, and that he never discussed what would happen if the buyers breached any of the agreements. Paplauskas testified that, for example, it was his custom to "tell

them it's a [promissory] note, [he] would tell them the loan amount, the interest rate, when the first payment [was] due, [when the] last payment [was] due, what the principal interest payment [was], and if there's a prepayment penalty." He further testified that "[t]hat's all on the first page of the note."

Similarly, Mr. Majewski testified that Paplauskas informed him and his wife what each document was and why they were required to sign it, but he stated that he could not recall any details relative to the explanation that Paplauskas had provided to them. Mrs. Majewski testified that she could not recall whether or not Paplauskas provided her and her husband with an explanation of each document.

Paplauskas testified that it was his recollection that Attorney Munns remained in the conference room for the entire closing process. Conversely, Attorneys Pagliarini and Munns testified that, at one point, Attorney Munns left the conference room to inform Attorney Pagliarini that Paplauskas was not an attorney and that she never returned to the conference room.

Paplauskas testified that, after the closing was completed and he had garnered all the required signatures, he left the law office and proceeded to send the materials to ServiceLink through FedEx. He testified that he did not record any of the documents in the land evidence records, did not control or release any of the money that was being held in escrow, and had no further involvement with the transaction after he transmitted the documents to ServiceLink.

On August 11, 2015, Attorney Pagliarini filed a complaint with the Committee alleging that Paplauskas may have engaged in the unauthorized practice of law by conducting the closing. Specifically, Attorney Pagliarini alleged that Paplauskas explained or otherwise advised the buyers with regard to the substance of the closing documents, which Attorney Pagliarini claimed was a

violation of G.L. 1956 § 11-27-2(2).[5]  After the conclusion of the investigational hearings held on March 1 and May 9, 2017, the Committee, by a three-to-two margin, found that Paplauskas had engaged in the unauthorized practice of law by conducting the closing.  The Committee indicated that this Court has not squarely addressed whether the activities that are involved in a real estate conveyance constitute the practice of law.  As such, the Committee also recommended that this Court should pronounce that conducting a real estate closing is the practice of law and that the conducting of such closings is to be reserved exclusively to attorneys, in order to protect the public welfare.  The Committee also recommended that no sanction be imposed on Paplauskas.

**B**

***In re Balkun***

On December 2, 2016, a real estate closing was scheduled for the purpose of conveying property located at 60 Pine Hill Road in Johnston, Rhode Island, from Ronald Cellucci and Mary Cellucci—mother and son—to Taylor Real Estate Investing LLC.  Balkun Title & Closing, Inc. (Balkun Title) was engaged by the sellers to prepare the deed, residency affidavits, and a power of attorney for Mary in favor of Ronald.[6]  The documents were prepared by a paralegal at Balkun Title.  In his testimony before the Committee, Daniel Balkun, who is not an attorney, was unable to state with certainty whether or not Attorney Andrew Pelletier, who was employed as an independent contractor by Balkun Title, had reviewed the just-referenced documents.[7]  Attorney

---

[5] General Laws 1956 § 11-27-2 provides that the verb "practice law" as used in that chapter means "the doing of any act for another person usually done by attorneys at law in the course of their profession, and, without limiting the generality of the definitions in this section, includes the following: * * * (2) The giving or tendering to another person for a consideration, direct or indirect, of any advice or counsel pertaining to a law question[.]"

[6] We refer to the members of the Cellucci family by their first names for the sake of clarity.  In so doing, we intend no disrespect.

[7] Daniel Balkun has never attended law school, nor is he admitted to practice law in Rhode Island or any other state.

Anthony Senerchia, who ultimately filed the complaint at issue with the Committee as to Balkun and Balkun Title, acted as the title insurance agent and as the settlement agent for the buyer.

Prior to the closing, Attorney Senerchia observed that two deeds had been recorded with respect to the property in 1960. The first conveyed the property to Mary and her husband Carmino Cellucci as joint tenants with the right of survivorship. The second deed, which was recorded several months later, was characterized as a "corrective deed done to correct avenue to road in many of the legal descriptions[.]" However, that instrument never recited the form of tenancy. Accordingly, Attorney Senerchia was of the opinion that that second deed had severed the joint tenancy and had resulted in a tenancy in common. There was also a subsequent deed recorded conveying the property from Mary to her son Ronald and herself. Upon discovering this information, Attorney Senerchia attempted to determine whether or not Carmino was still living. A paralegal at Balkun Title represented to Attorney Senerchia's office that Carmino was indeed still alive. The paralegal at Balkun Title obtained that information from the seller's real estate agent, but she did not do any independent research with respect to the issue. At the beginning of the December 2, 2016 closing, it came to Attorney Senerchia's attention that Carmino had in fact passed away. Consequently, the closing was adjourned, and Attorney Senerchia advised Ronald to obtain counsel to open a probate matter so that Carmino's interest in the property could be addressed. The matter was thereafter resolved in probate court. Ultimately, the closing was rescheduled for January 13, 2017, and it was completed at that time. In filing the complaint at issue, Attorney Senerchia indicated that, as a result of the delay caused by Balkun Title's error as

to whether or not Carmino had passed away, the buyer was able to negotiate a $5,000 reduction in the purchase price of the property.[8]

On January 19, 2017, the Committee received the complaint at issue from Attorney Senerchia, alleging that Balkun and his company, Balkun Title, had engaged in the unauthorized practice of law by representing and preparing documents for the sellers in connection with the sale of 60 Pine Hill Road. In its report, the Committee noted that its investigation of the specific complaint prompted it to "evaluate the operation of Balkun Title more generally." The Committee held four days of investigational hearings on September 14, September 26, November 14, and November 15, 2017, during which it heard testimony from Balkun, Attorney Senerchia, Attorney Pelletier, and paralegal Mignolia Rojas. That testimony elicited the following additional facts with respect to Balkun and Balkun Title.

On January 20, 2016, Articles of Incorporation were filed for Balkun Title with the Rhode Island Secretary of State. Balkun, who we reiterate is not an attorney, is the sole shareholder of Balkun Title. He testified that he started Balkun Title with the intention of offering real estate closings and "real estate and title services." In February 2016, Balkun filed an application with the Rhode Island Department of Business Regulation for a title insurance agent's license, and that application was granted on February 25, 2016. In its report, the Committee described a title insurance agent's license as follows: "[It] authorizes the licensed person to issue title insurance policies as an agent of a title insurer[;] * * * [o]nce the underlying real estate transaction closes,

---

[8] The Committee Report in the *Balkun* matter also refers to a second and separate real estate transaction in which Balkun Title drafted the same or similar documents for the seller as it had for the 60 Pine Hill Road transaction—*viz.*, the November 10, 2016 transfer of property located at 17 Renaudet Street in West Warwick from Orvis Luker and Deborah DiPietro to Nuno and Susan Medeiros.

the title insurance policy is issued, and the agent is then paid directly by the insurer based on the premium of the policy."

As the only shareholder of Balkun Title, Balkun oversees the daily operations of the company, and he draws a salary from that company. The bulk of Balkun Title's business has involved residential real estate transactions. According to Balkun, he has always been open about the fact that he is not an attorney. Nonetheless, Balkun Title has never employed any formalized procedure for the purpose of advising clients that Balkun is not an attorney.

With respect to the period of time at issue in this case, Balkun Title also employed Attorney Pelletier, four paralegals, and a bookkeeper. Attorney Pelletier was, at all pertinent times, admitted to practice law in Rhode Island as well as in Massachusetts. He maintains a private legal practice in addition to his duties with Balkun Title. Both Balkun and Attorney Pelletier testified that, with respect to the work he did for Balkun Title, Attorney Pelletier's client was Balkun Title. He said that his duties were to "review title abstracts, perform[ ] closings, draft[ ] deeds, and answer legal questions for the staff and Balkun Title's clients[.]"

Balkun and Balkun Title routinely conducted real estate closings and title examinations on behalf of real estate buyers. Balkun conducted about 75 to 80 percent of Balkun Title's Rhode Island closings. He testified that "notary closings" are a common practice in Rhode Island. The Committee Report in the *Balkun* matter states that, when Balkun conducts closings, the lender typically provides the *documents* to him in advance and that he then presents each document to the buyer for his or her signature. Balkun further testified that he provides a "brief explanation or brief description of what [each] document is" before obtaining the buyer's signature. Balkun added that, if a legal question were to arise at a closing, he would involve Attorney Pelletier.

Nevertheless, Balkun testified that he had never felt it necessary to suspend a closing so that a legal question might be addressed.

With respect to title examinations, the Committee Report in the *Balkun* matter indicated that, after a title search was completed, an abstract was returned to the paralegals at Balkun Title, and it was then presented to Attorney Pelletier and/or to the insurer for an examination of the title. However, the Committee Report in the *Balkun* matter also reflects the fact that Attorney Pelletier did not review every title search that had been performed on behalf of Balkun Title. The ultimate determination with respect to insurability of a title was with the insurer.

Also at issue before this Court are other services that Balkun and Balkun Title provide to real estate sellers: preparing the deed, the residency affidavit, and any powers of attorney that might be necessary in connection with a closing. According to the testimony before the Committee, upon receiving a request to draft any or all of these documents, a paralegal employed by Balkun Title would draft the documents based on templates used in past transactions and on information that might be contained in the pertinent purchase and sale agreements. Those templates were not always drafted or created by Attorney Pelletier; but, instead, according to Rojas, she used templates that she had used in her previous employment at law firms. The documents were generally not reviewed by Attorney Pelletier after they were drafted unless a paralegal identified a problematic issue during the drafting process. Rojas testified that only about 50 percent of the files that she opened were reviewed by Attorney Pelletier before closings were conducted.

According to the Committee Report in the *Balkun* matter, with respect to the drafting of deeds and determining the proper tenancy to articulate in the deed, "Balkan and Rojas indicated that the tenancy for the present sale is generally copied from the prior deed conveying the property

- 11 -

to the current seller[.]"  Notably, "[w]hen pressed by the Committee to describe 'joint tenancy[,] tenants in common, and tenants by the entirety,' Balkun offered a scattered explanation and concluded that, if asked by a seller about their tenancy, he 'offer[s] them to either find their own legal counsel or to have a conversation with [Attorney] Pelletier.'"

With respect to residency affidavits, the Committee Report in the *Balkun* matter indicated that a "residency affidavit is a standardized form designated by the Rhode Island Division of Taxation, pursuant to General Laws 1956 § 44-30-71.3, which requires a seller of real estate located in Rhode Island to certify whether they [*sic*] are a resident of the State of Rhode Island." The Committee Report in the *Balkun* matter indicated that Balkun Title relied on the seller's driver's license or the address listed for the seller in the purchase and sale agreement to determine the seller's residency.  According to the Committee Report, a seller's power of attorney, in the real estate context, is "an affidavit signed by a seller, authorizing another person to sign on their [*sic*] behalf or act in their [*sic*] place during a transaction."  During his testimony before the Committee, it was noteworthy that Balkun "could not articulate the legal significance of the terms 'limited' and 'durable' contained in the phrase 'limited durable power of attorney[.]'"

At the conclusion of the hearings, a unanimous five-person Committee voted in favor of finding, by a preponderance of the evidence, that Balkun and Balkun Title had engaged in the unauthorized practice of law.  However, the Committee recommended to this Court that no civil or criminal proceedings be initiated; rather, the Committee requested that this Court "make a pronouncement that the following acts constitute the practice of law and can only be performed by a lawyer: (a) conducting a title examination to determine the marketability of title, (b) conducting a real estate closing, (c) drafting a deed on behalf of a party to a real estate transaction, (d) drafting

a residency affidavit on behalf of a party to a real estate transaction, and (e) drafting a power of attorney on behalf of a party to a real estate transaction."[9]

C

*In re SouthCoast Title and Escrow, Inc.*

After Attorney Senerchia testified as a complainant at the hearing concerning Balkun Title, Balkun's attorney reacted by filing a complaint against Senerchia's company, SouthCoast Title and Escrow, Inc. (SouthCoast), alleging that it had engaged in the unauthorized practice of law with respect to the sale of 60 Pine Hill Road in Johnston. In that transaction, SouthCoast was hired to conduct the real estate closing. Attorney Senerchia, as an agent for SouthCoast, performed the service on SouthCoast's behalf.

As many of the facts relative to that transaction have already been described in an earlier section of this opinion, we will recite here only such additional facts as are relevant to the *SouthCoast* matter.

Attorney Senerchia is one of the two shareholders who own SouthCoast, which is a Rhode Island domestic business corporation that was incorporated on April 4, 2004. SouthCoast maintains an Interest on Lawyers Trust Account (IOLTA) to hold all real estate settlement funds that are processed in the course of its business. SouthCoast also employs two attorneys: Attorney

---

[9] We note that, additionally, the Committee concluded that conducting a title search was not the practice of law. The Committee was unable, on the record before it, to make a determination as to whether or not settlement services or negotiating short sales constituted the practice of law. We discern no error in the Committee's reasoning or conclusions as to those issues. The Committee also addressed certain "posts" on social media with respect to Balkun and Balkun Title and whether or not Balkun and Balkun Title were being held out to the public as being qualified to practice law. The Committee ultimately concluded that, by "utilizing Attorney Pelletier to perform tasks for its clients, Balkun Title held itself out as an entity that was qualified to practice law, which it was not." That conclusion was not included in the recommendation from the Committee, and we pass no judgment about it at this time.

- 13 -

Senerchia and Attorney John T. Sheehan III. In addition to operating SouthCoast, Attorney Senerchia also maintains a separate law firm with Attorney Sheehan—Senerchia & Sheehan, P.C. SouthCoast and the Senerchia & Sheehan law firm operate out of the same office.

Attorney Senerchia holds a license to act as a title insurance agent issued by the Rhode Island Department of Business Regulation. Attorney Senerchia testified that, when he is acting as a title insurance agent for SouthCoast, he conducts a title search and an examination of the title on the company's behalf. Although, in the majority of transactions, Attorney Senerchia performs a title search and examination while acting as a title insurance agent, he did state that there are occasions in which he performs title searches without acting as a title insurance agent.

In addition to title examinations, Attorney Senerchia conducts real estate closings on behalf of SouthCoast. He estimated that he performed between fifty and one hundred closings in Rhode Island within the year preceding his testimony. Attorney Senerchia testified that, in the majority of those closings, he acted as the title insurance agent. According to the SouthCoast Committee Report, Attorney Senerchia conducts closings in a similar manner as Paplauskas, except that he does not have the parties sign a "Notary Held Harmless" form.

With respect to conducting title examinations and real estate closings, the Committee recommended that this Court conclude that SouthCoast engaged in the unauthorized practice of law.[10] Despite the fact that Attorney Senerchia is a licensed attorney, the Committee determined

---

[10] We note that, additionally, the Committee found conducting a title search not to constitute the practice of law. With respect to settlement services, the Committee was unable to determine whether these activities constitute the practice of law. The Committee defined settlement services as recording the deed, issuing the title insurance policies, and disbursing the funds in escrow. Additionally, the Committee took issue with several statements set forth on SouthCoast's website; however, SouthCoast had resolved those issues prior to the hearing, so the Committee took no further action. We are unable to perceive any error in the Committee's reasoning or conclusions as to the issues referenced in this footnote.

that Attorney Senerchia was providing legal services for SouthCoast by conducting title examinations and closings.  The Committee argues that SouthCoast is, in essence, acting as if it were a law firm because it, in effect, provides legal services to its customers by having one of its employees—Attorney Senerchia—conduct closings and title examinations.

## II

## Standard of Review

"It has long been the law of this state that the definition of the practice of law and the determination concerning who may practice law is exclusively within the province of this [C]ourt." *In re Town of Little Compton*, 37 A.3d at 88 (deletion omitted) (quoting *Unauthorized Practice of Law Committee v. State Department of Workers' Compensation*, 543 A.2d 662, 664 (R.I. 1988)). We recognize that the General Assembly has occasionally enacted statutes that attempt to codify or regulate "the practice of law with little interference by this Court[,]" especially when such "legislative effort may be beneficial in protecting our citizenry from unqualified persons promoting themselves as skilled practitioners of the law[.]"  *Id.* (first quotation quoting *Department of Workers' Compensation*, 543 A.2d at 664-65).  However, we "reiterate that the Supreme Court reserves to itself the ultimate and exclusive authority to determine what does and does not constitute the practice of law within the state and to regulate those people qualified to engage in the practice." *Id.*

## III

## Discussion

Historically, ours has not usually been a nimble profession, capable of reacting deftly to changes in society and technology.  Indeed, we often cite venerable sources such as the Magna Carta as support for decisions about what is best in today's vastly different world.  There is, of

course, benefit in that, because reliance on precedent, even ancient precedent, provides a rule of law that is stable and predictable. On the other hand, there is also benefit in an ability to quickly adapt to a changing world. It is that conundrum we must now face with respect to the issues that confront us in these matters.

The matters presently before this Court require us to determine whether several activities that are all commonly part of residential real estate transactions constitute the practice of law. The Committee, in three separate matters, has recommended to this Court that we determine that the following actions constitute the practice of law and thus must be performed by a licensed attorney: (1) conducting a residential real estate closing; (2) examining a title for marketability; (3) drafting a deed; (4) drafting a residency affidavit; and (5) drafting a durable power of attorney. We emphasize at the outset that our opinion regarding these activities is limited to the context of residential real estate transactions because only residential real estate transactions were before the Committee and, accordingly, only such transactions are before us now.

We also note at the outset that this Court has never opined as to whether any of the five above-referenced activities constitute the practice of law. We have said that the practice of law "embraces conveyancing" and that "the giving of legal advice on a large variety of subjects, and the preparation and execution of legal instruments covering an extensive field of business and trust relations and other affairs." *Rhode Island Bar Association*, 55 R.I. at 134, 179 A. at 144 (quoting *In re Opinion of the Justices to the Senate (Mass.)*, 194 N.E. 313, 317 (Mass. 1935)). However, that general statement concerning conveyancing is not sufficient to provide guidance concerning the wide variety of activities that surround modern-day residential real estate transactions. We must be ever mindful of the new realities of the current day.

In deciding whether an act constitutes the practice of law, we have consistently declined to provide a specific definition for what constitutes the practice of law and, instead, we have focused on determining what it is on a case-by-case basis. *See In re Town of Little Compton*, 37 A.3d at 85-86 (acknowledging that the practice of law can be difficult to define); *In re Law Offices of James Sokolove, LLC*, 986 A.2d at 1005 ("[T]he practice of law does not easily lend itself to concise definition[.]"); *Rhode Island Bar Association*, 55 R.I. at 126, 179 A. at 140 ("[W]e adopt [the] view in refraining from any attempt at definition [of the practice of law] here."). What we have consistently focused on in making such a case-by-case analysis is the public welfare. *In re Town of Little Compton*, 37 A.3d at 92 ("Keeping the public welfare at the forefront of our considerations, we must also weigh the public policy interests involved[.]").

In the process of determining what is and what is not the practice of law, we find the following observation by the Supreme Court of New Jersey to be particularly instructive:

> "The question of what constitutes the unauthorized practice of law involves more than an academic analysis of the function of lawyers, more than a determination of what they are uniquely qualified to do. It also involves a determination of whether non-lawyers should be allowed, in the public interest, to engage in activities that may constitute the practice of law." *In re Opinion No. 26 of Committee on Unauthorized Practice of Law*, 654 A.2d 1344, 1345-46 (N.J. 1995).

The Supreme Court of New Jersey's analysis assists us in clarifying our own initial reactions. Activities which, on a purely theoretical level, might be deemed to constitute the practice of law, may not be considered to be the practice of law in a practical sense unless it is in the public interest to require an attorney to perform these activities.

To facilitate our analysis of what is in the public interest, we believe it to be helpful, if not necessary, to review the enactments of the General Assembly in this area. Even though defining the practice of law is squarely within this Court's ultimate authority, we have never indicated that

- 17 -

the General Assembly, a policy-making branch of government, should be wholly barred from speaking out in this area. Indeed, we have said that we will enforce a statute concerning the practice of law as long as it aids and does not subvert our authority. *In re Town of Little Compton*, 37 A.3d at 91-92; *Department of Workers' Compensation*, 543 A.2d at 664; *Rhode Island Bar Association*, 55 R.I. at 127, 179 A. at 141. As a result, while remaining aware of our absolute authority to define the practice of law, we consider it wise to afford some level of deference to the Legislature in this area. *See Chambers v. Ormiston*, 935 A.2d 956, 966 (R.I. 2007) ("Ours is not a policy-making branch of the government."); *Town of Johnston v. Santilli*, 892 A.2d 123, 133 (R.I. 2006) (debates over public policy "should be resolved in the public forum or in the Legislature, not in the courts").

The General Assembly has already entered the field in the context of real estate transactions. Section 11-27-16(a)(1) provides, in pertinent part:

> "(a) Nothing in §§ 11-27-2–11-27-11 or §§ 11-27-16–11-27-18 shall be construed to limit or prevent:
>
> (1) Any corporation, or its officers or agents, lawfully engaged in the insuring of titles to real property from conducting its business, and the drawing of deeds, mortgages, and other legal instruments in or in connection with the conduct of the business of the corporation."

Without question, § 11-27-16(a)(1) must be read through the prism of § 11-27-5, which prohibits anyone who is not "a duly admitted member of the bar of this state" from practicing law. Thus, the General Assembly sought, through the enactment of § 11-27-16(a)(1), to protect certain activities of title insurance companies and their agents from being considered the practice of law. In G.L. 1956 § 27-2.6-3, the General Assembly further provided contours for the permitted actions of title insurers. Specifically, § 27-2.6-3(17) enumerates the following as permitted activities:

determining insurability based upon review of a search or title abstract; handling escrows, settlements, or closings; recording closing documents; and other related activities.

That being the case, we must next determine whether the General Assembly, in enacting this legislation, has impermissibly invaded or infringed upon the constitutional authority of this Court to define what is, and what is not, the practice of law. After reviewing the relevant statutory framework and the record before us, we conclude that, for the most part, § 11-27-16(a)(1) and chapter 2.6 of title 27 aid, and do not subvert, this Court's ultimate authority in this area. We hold this for three reasons.

First, the statutes did not arise from an effort to reverse a pronouncement from this Court that held that these activities were the practice of law.

Second, the General Assembly created the regulatory scheme known as the Rhode Island Title Insurers Act, at chapter 26 of title 27, that provides for significant licensing and oversight. By enacting these measures, the General Assembly sought to protect the public from any untoward effects that might be occasioned by non-attorneys acting in this area. These measures promote the proper administration of justice by preventing the "great and irreparable injury [that] can come to the people" from "the unwarranted intrusion of unauthorized and unskilled persons into the practice of law." *In re Town of Little Compton*, 37 A.3d at 85 (brackets omitted) (quoting *Rhode Island Bar Association*, 55 R.I. at 131, 179 A. at 143).

Finally, the statutory exemption draws its history from legislation that was first enacted in 1917. There is no question that the public and the title industry have relied in good faith on these statutes for over one hundred years without the practice being called to our attention with a suggestion that it subverted our authority. In the meantime, an entire industry has arisen. Indeed, all parties to these matters have agreed that the conducting of real estate closings by non-attorneys

is commonplace in Rhode Island and that it has been commonplace for a very long time. This factor weighs heavily in favor of this Court not upsetting the apple cart and doing damage to this industry, or the statutory and regulatory framework. We emphasize, however, that this factor does not, and will not, prevent this Court from exercising its authority to protect the public should the need arise, without regard to how long that activity has continued.

With some important exceptions, we hold that what the statutes at issue authorize does not constitute the unauthorized practice of law. We deem it necessary for the purposes of clarity to point out that the statutes at issue authorize various actions related to a real estate transaction to be carried out by a non-attorney only when that non-attorney is acting as a title insurance agent (*i.e.*, issuing the title insurance policy) in the context of the sale of that parcel of real estate.[11]

We are further of the opinion that some of the activities authorized by § 11-27-16(a)(1) and § 27-2.6-3(17) do subvert our authority and thus require added levels of protection for the public and the efforts of an attorney. We will address each of the five issues raised in the Committee's reports in turn.

**A**

**Real Estate Closings**

The sole issue in common among the three matters before us is whether conducting a closing in and of itself constitutes the practice of law. The Committee asks this Court to squarely pronounce that it does. To answer this question, we find it beneficial to examine the custom and practice of both our state and others, and the policy considerations involved.

---

[11] In the context of the three reports, we are confronted with services performed in connection with real estate closings only by employees and/or agents of title insurance companies.

**1**

**Real Estate Closings Nationally**

A number of other states have addressed the issue of whether conducting a closing is the practice of law. *See, e.g.*, *Countrywide Home Loans, Inc. v. Kentucky Bar Association*, 113 S.W.3d 105, 107 (Ky. 2003); *Real Estate Bar Association for Massachusetts, Inc. v. National Real Estate Information Services*, 946 N.E.2d 665, 671 (Mass. 2011); *In re Opinion No. 26 of Committee on Unauthorized Practice of Law*, 654 A.2d at 1345. However, a review of the jurisdictions that have addressed this issue reveals the existence of inconsistent results. *See Real Estate Bar Association for Massachusetts, Inc.*, 946 N.E.2d at 684. *But see Countrywide Home Loans, Inc.*, 113 S.W.3d at 121. The Committee correctly noted, in its report in the *Paplauskas* matter, that some jurisdictions have prohibited non-attorneys from performing real estate closings, while others have expressly allowed non-attorneys to perform them.[12] We note three jurisdictions that provide examples of the various approaches that have been adopted.

In rendering its report, the Committee relied heavily on the case of *Real Estate Bar Association for Massachusetts, Inc.* There, the Supreme Judicial Court of Massachusetts concluded that, because "[t]he closing is * * * a critical step in the transfer of title and the creation of significant legal and real property rights[,]" only attorneys may perform real estate closings. *Real Estate Bar Association for Massachusetts, Inc.*, 946 N.E.2d at 684. The Supreme Judicial Court reasoned that the Commonwealth had a "common and long-standing practice" that required

---

[12] *See Formal Advisory Opinion No. 04-1*, 626 S.E.2d 480, 481 (Ga. 2006); *Real Estate Bar Association for Massachusetts, Inc. v. National Real Estate Information Services*, 946 N.E.2d 665, 685 (Mass. 2011); *State v. Buyers Service Company, Inc.*, 357 S.E.2d 15, 19 (S.C. 1987). *But see Countrywide Home Loans, Inc., v. Kentucky Bar Association*, 113 S.W.3d 105, 121 (Ky. 2003); *In re Opinion No. 26 of Committee on Unauthorized Practice of Law*, 654 A.2d 1344, 1361-62 (N.J. 1995); *Bar Association of Tennessee, Inc. v. Union Planters Title Guaranty Company*, 326 S.W.2d 767, 772 (Tenn. 1959).

an attorney to be involved in the closing or settlement of real property conveyances. *Id.* Moreover, the court determined that real estate closings in Massachusetts involve two essential responsibilities: (1) to ensure marketable title; and (2) to effectuate a valid transfer of the interests being conveyed at the closing. *Id.* at 685-87. The court propounded its "belief that the closing attorney must play a meaningful role in connection with the conveyancing transaction that the closing is intended to finalize." *Id.* at 685. The Supreme Judicial Court of Massachusetts further opined that a closing attorney's professional and ethical responsibilities require actions "not only at the closing but before and after it as well." *Id.* With that, the court declined to deviate from what it considered to be the Commonwealth's long-established practice of requiring attorneys to conduct real estate closings. *Id.* at 684.

At the other end of the spectrum is the case of *In re Opinion No. 26 of Committee on Unauthorized Practice of Law*. There, the Supreme Court of New Jersey permitted sellers and buyers to proceed with a real estate transaction without counsel. *In re Opinion No. 26 of Committee on Unauthorized Practice of Law*, 654 A.2d at 1345. The court noted that the "South Jersey practice" was for neither the buyer nor the seller to engage the service of an attorney for a real estate transaction. *Id.* at 1349-51. The court stated that the ultimate touchstone in its determination was the public interest and that, because the record contained little proof of actual harm, the public interest was not disserved when parties proceeded with real estate transactions without counsel. *Id.* at 1346. Additionally, the court determined that the record indicated that sellers and buyers without counsel saved money because they were not required to pay attorneys' fees. *Id.* Although the court noted that the best practice would be for the parties to retain counsel, it nonetheless held that the parties should not be required to do so, so long as they were informed

that they had the right to obtain counsel and were apprised of the risks which they assumed by proceeding without counsel. *Id.* at 1359-61.

Kentucky appears to have taken the middle ground in the *Countrywide Home Loans, Inc.* case. There, the Supreme Court of Kentucky held "that it is not the unauthorized practice of law for a layperson to conduct a real estate closing *for another party*." *Countrywide Home Loans, Inc.*, 113 S.W.3d at 121 (emphasis added). The court characterized a real estate closing as the "final event" of the real estate transaction where the parties execute documents and funds transfer hands. *Id.* at 122. The court described that many of the activities in a real estate transaction that involve the practice of law are resolved *before the closing occurs*, such as reviewing the contract of sale; comparing the legal deed description with the plat plan; determining whether the plat contains any encumbrances, covenants, or restrictions; and reviewing and interpreting of a title opinion or insurance policy. *Id.* at 126. The Kentucky Supreme Court noted that a closing involves many "ministerial acts" that clearly do not involve the practice of law such as handling financial matters, payments, and loan insurance. *Id.* at 122. However, it concluded that there are other acts included in a closing that are "equally ministerial in nature[,]" but that carried the potential for legal issues to arise—for example, directing a party where to sign a particular document or delivering copies of the signed documents. *Id.* The court determined that the *mere potential* for legal issues to arise did not transform the handling of a closing on behalf of another party into the unauthorized practice of law, so long as the layperson conducting the closing does not offer legal advice on questions that may arise during the course of the transaction. *Id.* at 122, 128. Ultimately, the court held that conducting a real estate closing constituted the practice of law "if (1) it requires legal knowledge or legal advice, (2) involves representation, counsel or advocacy on behalf of another party, and

(3) involves the rights, duties, obligations, liabilities, or business relations of that other party." *Id.* at 121.

**2**

**Real Estate Closings in Rhode Island**

In assessing the custom and practice of real estate closings in our state, based on the limited record before us, it appears that, unlike the situation in Massachusetts, there is a long-standing, century-old practice in Rhode Island permitting title insurance companies and their agents to conduct a closing. Significantly, Paplauskas testified before the Committee that he had "conducted an average of fifty to seventy[-]five closings per month over the past twelve months in Rhode Island." He further testified that, in 95 percent of the closings that he performed since the beginning of his involvement in this industry in 1969, the buyer was not represented by an attorney. Moreover, while Attorney Pagliarini testified that this was the first instance in his experience in which a notary public appeared to conduct a closing, he also testified that he was aware that "it occurs daily because there are title companies that are run by notaries public that do not have attorneys on staff. It does happen daily[.]"

This custom and practice appears to have been spurred by the General Assembly's attempt to authorize such action. Section 27-2.6-5(3) purports to authorize title insurers to "[p]erform ancillary activities * * * including, examining titles to real property * * *." Section 27-2.6-3(18)(ii)(C) is consistent with this position by defining a title insurance business to include the handling of escrows, settlements, or closings.

To be certain, we have not spoken on such statutory provisions, and we do not retreat from the principle that this Court retains the exclusive authority to determine what is, and what is not, the practice of law. *See In re Town of Little Compton*, 37 A.3d at 88. We simply cite the referenced

statutory provisions to emphasize and explain the custom and practice of non-attorneys conducting closings that has evolved in this state because title companies have apparently acted in good faith under the statutes, and further that there has been a paucity of consumer complaints.

## 3

## Policy Considerations

Although the current practice of allowing title insurance companies and their agents to conduct real estate closings is commonplace in Rhode Island, "this factor alone does not provide the necessary basis for this Court to authorize this practice." *In re Town of Little Compton*, 37 A.3d at 92. We are aware of the over-riding consideration that "[k]eeping the public welfare at the forefront of our considerations, we must also weigh the public policy interests involved" when we evaluate that practice. *Id.*

First and foremost, allowing title insurance companies and their agents to conduct closings benefits the public by increasing competition, which will result in decreased costs and potentially more choices as to how and where closings are conducted. Conversely, restricting the handling of closings to attorneys would have the opposite effect, thereby increasing cost and reducing choice and availability. Indeed, one group of amici point out in their brief filed in the *Paplauskas* matter that the average closing fee for attorney-only states is $240 higher than states that permit both attorneys and laypersons to conduct closings.[13]

Second, if only attorneys are permitted to conduct closings, we would be concerned with the resultant unresolved questions, which would include: (1) whom does the attorney represent;

---

[13] See the amicus brief filed on behalf of the Rhode Island Bankers Association, Rhode Island Mortgage Bankers Association, Rhode Island Association of Realtors, Inc., Cooperative Credit Union Association, Equity National Title and Closing Services, Inc., and Lincoln Abstract & Settlement Services, LLC.

(2) how many attorneys are necessary; and (3) is an attorney required for all types of real estate closings? Requiring each party to be represented by an attorney would increase the transactional costs associated with purchasing a home. *See Countrywide Home Loans, Inc.*, 113 S.W.3d at 123. If only one or two attorneys must be present, can the attorney or attorneys effectively provide representation to multiple parties within the confines of the Rhode Island Supreme Court Rules of Professional Conduct? *See Credit Union Central Falls v. Groff*, 966 A.2d 1262, 1267 (R.I. 2009) ("Real estate closings present a particularly thorny dilemma for the bar because a closing attorney often undertakes responsibilities to various parties to the transaction[.]"). If an attorney is required to conduct a residential real estate closing such as the closings presented to us in these matters, does that mean that an attorney is required for all types of closings, such as for obtaining a purchase-money mortgage, refinancing, a second mortgage, home-equity loans, and lines of credit?

Third, and most importantly, we have not been apprised of any widespread harm to the public occasioned by title insurance companies or their agents conducting closings. We recognize that the Committee's investigatory powers are limited to the matter before it and that the Committee does not have the authority to conduct a state-wide investigation. Nonetheless, the record is limited as to any harm to the public at large. Indeed, neither the amici nor the Committee has come forward with evidence of real harm to the public. What they have pointed to are theoretical harms that might occur in the event that errors are made. From our review of how other jurisdictions have addressed this issue, this theoretical harm has not materialized.[14] *See In re Opinion No. 26 of Committee on Unauthorized Practice of Law*, 654 A.2d at 1347-48 (noting that

---

[14] We therefore should proceed cautiously in this area, there presently being no evidence of actual harm.

- 26 -

a special master had conducted sixteen days of hearings and did not find any harm to the public).

For these reasons, we conclude that the General Assembly's policy decision to enact chapter 2.6 of title 27 and allow title insurance companies and their agents to handle closings, is consistent with broad public policy interests. Therefore, we utilize such statutes as an aid in exercising our sole authority to determine whether conducting a closing is the practice of law.

## 4

## The Rhode Island Approach

Nearly eighty-five years ago, this Court said that the practice of law "embraces conveyancing, the giving of legal advice on a large variety of subjects, and the preparation and execution of legal instruments covering an extensive field of business and trust relations and other affairs." *Rhode Island Bar Association*, 55 R.I. at 134, 179 A. at 144. Today, however, we note that conveyancing is not a "unitary, indivisible activity that constitutes the practice of law," but rather carries many "discrete services and activities" that do not qualify as the practice of law. *Real Estate Bar Association for Massachusetts, Inc.*, 946 N.E.2d at 675. "Whether a particular service or activity [in a closing] constitutes the practice of law remains a fact-specific inquiry." *Id.*

Having addressed the practice of conducting real estate closings in Rhode Island and nationally, as well as the policy considerations involved, it is our opinion that the best course of action is to, for the most part, maintain the status quo of allowing title insurance companies and their agents to conduct closings in conjunction with the issuance of a title insurance policy. We are in agreement with the Supreme Court of Kentucky to the effect that many of the acts involved in a real estate transaction that comprise the practice of law are "resolved before the parties ever meet at the closing table." *Countrywide Home Loans, Inc.*, 113 S.W.3d at 126. Accordingly, it is

our view that title insurance companies and their agents may conduct closings in accordance with chapter 2.6 of title 27, *so long as* the closing agent limits his or her activities to functions such as identifying a document, directing a party where to sign, and delivering copies of the signed documents after execution.

However, a closing agent must proceed with caution because conducting a closing will constitute the practice of law if it involves the imparting of legal advice; involves representation, counsel, or advocacy on behalf of another; or involves the rights, duties, obligations, liabilities, or business relations of another. *See Countrywide Home Loans, Inc.*, 113 S.W.3d at 121. Indeed, because a closing can quickly and unexpectedly involve the act of giving legal advice, transparency is of the upmost importance.

To ensure transparency and prevent the closing agent from crossing the line, a non-attorney closing agent must do the following to avoid engaging in the unauthorized practice of law. First, before the closing begins, the closing agent must communicate to the buyer and the seller that: (1) the closing agent is not an attorney; (2) he or she does not represent the buyer or the seller; (3) he or she cannot and will not give legal advice; and (4) if the buyer or seller has a legal question, the buyer or seller should suspend the closing and seek counsel from an attorney. Second, the closing agent must present a written notice to the buyer and the seller that contains all of these warnings and require the buyer and the seller read the document. That notice shall be the first document presented and signed at the closing. Third, the closing agent must require that the buyer and the seller sign a copy of the notice to acknowledge that the closing agent has given these warnings and that the buyer and the seller understand them. Fourth, the closing agent must sign the notice to acknowledge that he or she has orally explained the notice to the buyer and the seller. Finally, the closing agent must retain the signed copy of the notice and give a copy to the buyer

and a copy to the seller. It is our hope that the title insurance company, its agent, or the Department of Business Regulation will design a notice form. However, this notice should be separate from all other documents, and it should not contain additional material.

As evidenced by the credible arguments on both sides, the many amicus curiae briefs filed, and the split in authority amongst the states, we find this issue to present an extremely close question with tremendous impact on real estate practice in the State of Rhode Island. We reiterate that we do not express today that the parties to a real estate transaction are better off proceeding without counsel. Indeed, the best and most prudent practice would be to retain counsel for guidance at every step of the transaction. However, based on the limited record before us and the lack of evidence indicating that the public has been harmed, title insurance companies and their agents should be permitted to conduct closings when they are issuing title insurance and when they otherwise act in accordance with chapter 2.6 of title 27, and as outlined *supra*.

If the present situation changes and we become aware that the public interest has been harmed by non-attorneys conducting closings, we will intervene. We know that the Committee, the Attorney General, and the Rhode Island Bar Association are conscientious and vigilant and will inform this Court if such harms occur. However, because such harm has not been shown, we decline at this time to overturn a century-old statutorily authorized practice by requiring that attorneys conduct real estate closings.

## B

### Title Examination

The examination of title and the determination that the title is marketable are crucial to the protection of the buyers in a real estate conveyance. An erroneous title examination can seriously harm not only the buyer but also those who may acquire title to the same property for decades

thereafter.  Although title insurance may cover some or all of these potential liabilities, the buyer's use and enjoyment of his or her property and the marketability of the property might still be affected.  Those liabilities and costs would, in most cases, be alleviated by early and prompt detection during a proper title examination.

We look to the statutes as an aid in addressing what is in the public welfare.  We note that the General Assembly has authorized agents of title companies, whether licensed attorneys or not, to examine the title to determine marketability or, at the very least, insurability.[15]  To be sure, title insurance companies and their agents have the experience and training to properly examine a title for defects.  We accept the representations that have been made to us that title insurers are diligent in discovering any defects in title and thereby protecting the buyer and the lending institution from issues that may arise at a later time.  On the other hand, attorneys are in the best position to determine marketability of title.  Property law is complex and, in our opinion, the soundness of the title should be subject to an attorney's opinion for the protection of the public.

Accordingly, after careful consideration of the issue, we conclude that it is permissible for title insurance companies and their agents to conduct title examinations without engaging in the unauthorized practice of law only if an attorney engaged or employed by the title insurance company conducts the title examination.  In order to protect, in particular, the buyer who is most at risk in this transaction, in our judgment, a licensed attorney must conduct a title examination for marketability.  No other employee or agent other than a licensed attorney may perform this function for the title insurance company.  Even though the main purpose of this endeavor is to benefit the buyer, we will not require the title insurance company to engage outside counsel to

---

[15] It has been represented to this Court that there is little difference between insurability and marketability because a title insurance company will not insure a title that is not marketable in the residential real estate context.

represent the buyer's interest, nor must the buyer do so.  The title may be examined by a licensed attorney engaged by the title insurance company.

It may appear that our holding in this regard still results in some level of risk for the buyer because the attorney is examining the title not on his or her behalf; however, we are satisfied that the buyer nonetheless has protection.[16]  Under our precedent, an attorney engaged by a title insurance company owes a duty of care not only to the title insurance company, but also to the buyer as a third-party beneficiary.  *See Credit Union Central Falls*, 966 A.2d at 1272 ("We now recognize that the liability of an attorney may extend to third-party beneficiaries of the attorney-client relationship if it is clear that the contracting parties intended to benefit the third party.").  In our judgment, that duty of care will offer sufficient protection to the buyer.

## C

### Drafting a Deed

We now turn our attention to the issue of whether or not it is in the public interest for this Court to determine that drafting a deed for another by a non-lawyer, in connection with a residential real estate transaction, constitutes the unauthorized practice of law.  The Committee Report in the *Balkun* matter concluded that the drafting of a deed was the practice of law and thus must be done by an attorney.  Specifically, the Committee Report stated that a "primary function of a deed is to properly define and articulate the tenancy or property interest being conveyed."  In reaching that conclusion, the Committee further relied on the fact that there are "innumerable ways in which the language and contents of a deed can affect the legal rights of parties to a real estate transaction[.]"

---

[16] In so holding, we do not retreat in the slightest from our admonition at the beginning of this opinion that all parties should be represented by licensed attorneys.

After thoroughly considering the findings and arguments of the Committee, as well as the arguments of Respondents and the amici, we are in agreement with the Committee that drafting a deed for another by a non-attorney constitutes the unauthorized practice of law in Rhode Island. Thus, we hold that it is in the public interest that a licensed attorney must either draft the deed himself or herself or carefully review a deed that has been drafted by a non-attorney.

We have given serious consideration to the fact that the General Assembly has permitted non-lawyers to draft deeds in connection with insuring title pursuant to § 11-27-6(a)(1). However, after extensive review of the issue, we are of the opinion that the General Assembly has, in this respect, strayed into the parameters of this Court's authority. *See In re Town of Little Compton*, 37 A.3d at 91-92. As we have previously stated, we reserve to this Court the "ultimate and exclusive authority to determine what does and does not constitute the practice of law within the state[.]" *Id.* at 88. It is the view of this Court that, notwithstanding the language of § 11-27-16(a)(1), drafting a deed for another person constitutes the practice of law and must be done by or carefully reviewed by a licensed attorney.

The deed is the most important document at a real estate closing. Not only is it the document which memorializes the transfer of legal title, it also defines the tenancy and property interest which are being conveyed. *See Commonwealth v. Jones & Robins, Inc.*, 41 S.E.2d 720, 727 (Va. 1947) ("[I]t was deemed advisable to permit a real estate broker to prepare simple contracts of sale, options, leases, etc., and to prohibit him from preparing legal instruments whereby the legal title to property passes from the seller to the purchaser."). The potential for error from allowing a non-attorney, who may well not be familiar with the legal effect of the tenancy listed on a deed, the restrictions or encumbrances affecting the conveyed property, or the

peculiarities of a particular description of the property, to be responsible for drafting that deed without oversight of any kind, is immense.

What is more, in the *Balkun* matter particularly, we do have evidence in the record that title insurance companies and their agents may, on occasion, be making critical mistakes in drafting. The testimony before the Committee reflected the fact that a paralegal at Balkun Title would customarily draft a deed for a real estate closing based on templates used in past transactions. Of particular concern to this Court is the fact that the paralegal simply copied the tenancy on the prior deed in determining the tenancy for the sale at issue. By way of example of the potential for error in such a practice, if a mother and son owned property as tenants in common and sold the property to a married couple, paralegals at Balkun Title may well denominate the tenancy of the married couple as tenants in common. However, it goes without saying that it would be inestimably more beneficial to the married couple to own the property as tenants by the entirety. A mistake of that magnitude has the potential for a serious and lasting impact on the property rights of the buyers. *See State v. Buyers Service Company, Inc.*, 357 S.E.2d 15, 18 (S.C. 1987) ("The reason preparation of [certain] instruments by lay persons must be held to constitute the unauthorized practice of law is * * * for the protection of the public from the potentially severe economic and emotional consequences which may flow from erroneous advice given by persons untrained in the law."). Also of concern to us is the fact that, in his testimony, Balkun himself was unable to articulate the difference between joint tenancy, tenancy in common, and tenancy by the entirety. Balkun stated that, if an issue came up concerning the type of tenancy, he would refer the party to Attorney Pelletier or another attorney. However, and in the face of that testimony, he also testified that he has never had to interrupt a closing to address such a legal question.

We also note that, at a closing, the lender and the title insurer are concerned with ensuring good title in the event that the lender must foreclose on the property at a later date. The nature of the tenancy to be conveyed and any other restrictions on the property, such as easements, therefore, may not be of as much importance to the lender and the title insurer as they would be to the buyer because such errors do not impact the insurability of the title itself at the time of the closing.

Accordingly, it is clear to this Court that drafting a deed requires specific legal knowledge and must be done by a licensed attorney or be carefully reviewed by a licensed attorney. *See People ex rel. Illinois State Bar Association v. Schafer*, 87 N.E.2d 773, 777 (Ill. 1949) (stating that "if the advice given or the service performed requires legal skill or knowledge, or more than ordinary business intelligence, it constitutes the practice of law").

**D**

**Drafting a Residency Affidavit**

Turning to the issue of whether or not drafting a residency affidavit on behalf of another constitutes the unauthorized practice of law, it is our opinion that the public interest dictates that drafting a residency affidavit for another in conjunction with providing title insurance for a real estate transaction does not constitute the unauthorized practice of law. We reach that conclusion after thorough consideration of the arguments of the parties and the amici.

According to the Committee Report in the *Balkun* matter, a residency affidavit is a "standardized form designated by the Rhode Island Division of Taxation, pursuant to General Laws 1956 § 44-30-71.3, which requires a seller of real estate located in Rhode Island to certify whether they [*sic*] are a resident of the State of Rhode Island." From our review of the form that was provided by the Division of Taxation, all that is required of an individual who is selling property is that he or she fill out the seller's name, address, telephone number, social security

number, the closing date, and the names of all the owners appearing on the deed. If the seller is a corporation or a partnership, there are additional requirements. This document must then be signed by the seller under the penalties of perjury and notarized.

It is our opinion that a title insurance company and its agents do not engage in the unauthorized practice of law by filling out or drafting the residency affidavit on behalf of a seller. For the majority of sellers, drafting the residency affidavit will be easily accomplished and will not require the engagement of an attorney. We note that our determination of what is in the public interest in this respect was informed by the fact that drafting a residency affidavit is one of the ancillary activities that the Title Insurers Act authorizes title insurance companies and their agents to perform when they are issuing title insurance.

However, it is important to note that, while on the surface this form may be easily filled out for most individuals, issues of residency can sometimes be complicated. The rules governing state residency may be complex, especially in cases where an individual has spent substantial amounts of time in more than one state during the year. Because the seller attests to his or her residency under the penalties of perjury, a misinformed seller may expose himself or herself to serious liability. For that reason, to protect the public, we further hold that, if the seller has a question over his or her residency, the seller must consult an attorney. The title insurance company and its agent may not provide advice or answer a seller's question concerning his or her residency, but must refer the seller to an attorney, which can include an attorney engaged by or employed by the title insurance company.

## E

## Drafting a Durable Power of Attorney

Turning to the issue as to whether or not drafting a durable power of attorney for the limited purpose of a real estate closing constitutes the unauthorized practice of law, it is our opinion that drafting that document does not constitute the unauthorized practice of law. We note that drafting a durable power of attorney is also one of the ancillary activities that the Title Insurers Act authorizes title insurance companies and their agents to perform when they are issuing title insurance.

A durable power of attorney for the closing is employed when one of the buyers or sellers is unable personally to attend the closing to effectuate the purchase and sale. In that case, the absent party may grant a limited power of attorney to another individual to allow that individual to act on his or her behalf at the closing. From our review, it appears that, in most cases, the title insurance company or its agents employs a form document and merely substitutes the names and other relevant information.

However, as we recognized with respect to the residency affidavit, the buyer or seller exposes himself or herself to significant risks when granting another person a durable power of attorney. A durable power of attorney, if not strictly limited, has the potential to give an individual considerable power over the life and property of another. To protect buyers and sellers, we hold that the durable power of attorney must be limited to the closing. If the durable power of attorney is not so limited, then, in this context, the drafter is engaging in the unauthorized practice of law. To reiterate, if the durable power of attorney goes further than that limited authority, then, despite the language of the statute, in such context, the drafter is engaging in the unauthorized practice of law.

## IV

## Conclusion

Addressing the three matters at hand, we will explain how the above-articulated principles affect each of the matters before us.

## A

### *In re Paplauskas*

Based on our review of the record, it appears that Paplauskas was acting within his rights under the statute, because ServiceLink did indeed issue a title insurance policy to the buyers. Moreover, although Paplauskas characterized himself as an independent contractor, it is clear to us that he was acting as an agent on behalf of ServiceLink at the closing. "An agency relationship exists when: (1) the principal manifests that the agent will act for him, (2) the agent accepts the undertaking, and (3) the parties agree that the principal will be in control of the undertaking." *Oliver v. Narragansett Bay Insurance Company*, 205 A.3d 445, 452 (R.I. 2019) (quoting *Credit Union Central Falls*, 966 A.2d at 1268). Paplauskas testified that he was contacted and authorized by ServiceLink to conduct the closing. He was provided with the documents that needed to be executed at the closing by ServiceLink, along with an envelope to return those documents to ServiceLink after execution. Paplauskas did not record any of the documents after they were executed and had no control over any funds or any other aspect of the transaction.

Paplauskas, at the start of the closing, provided the buyers with a one-page document titled "Notary Held Harmless," which indicated that he was acting only as a notary public and not as an attorney, and he immediately informed the buyers of that fact. During the closing, he presented each document to the buyers, identified the document by its title, provided an overview, and asked them to review and sign where appropriate. Paplauskas stated that his overview consisted of the

name and terms of the document, but that he never answered any questions regarding the document or consequences of noncompliance in connection with the document. Although the buyers remembered Paplauskas "explaining stuff," they could not recall any details about the explanation. It does not appear from the record that Paplauskas provided any legal advice nor did he answer any questions—in fact, the buyers had no questions. After he obtained all the necessary signatures, he collected the documents along with the deed provided by the sellers' attorney, put the documents in a FedEx envelope provided by the lender, and shipped them directly to ServiceLink. That concluded Paplauskas's involvement in the transaction. Accordingly, we hold that Paplauskas was not engaged in the unauthorized practice of law when he conducted the 528 Nanaquaket Road closing at issue on behalf of ServiceLink.

## B

### *In re Balkun*

In the *Balkan* matter, we begin by reiterating the acts undertaken by Balkun and Balkun Title which are at issue. With respect to residential real estate buyers, Balkun and Balkun Title conducted closings and title examinations. Balkun Title also prepared deeds, residency affidavits, and powers of attorney for sellers of residential real estate.

With respect to conducting closings, Balkun testified that he presented each document to the buyer for his or her signature and gave a brief explanation or description of each document. In this Court's judgment, Balkun and Balkun Title do not engage in the unauthorized practice of law when conducting a closing if they are issuing the title insurance policy or otherwise acting on behalf of a title insurer. That being said, to comply with this Court's opinion, Balkun must explain to the parties orally and in writing (as set forth *supra*) that he is not an attorney, that he does not represent either party, that he cannot give legal advice, and that, if a legal question arises, the

closing must be suspended to allow the party or parties to seek the advice of an attorney. He also must present a written notice to that effect to the parties and have it signed by the parties and he must sign it himself. Balkun must keep a copy of the written notice and provide one to the parties.

According to the testimony in the *Balkun* matter, Attorney Pelletier did examine some, but not all, of the title searches conducted by Balkun Title. In our opinion, those title examinations conducted by someone other than Attorney Pelletier or some other licensed attorney amount to the unauthorized practice of law. Accordingly, Balkun Title can continue to provide title examinations to its clients when it is issuing the title insurance policy, without engaging in the unauthorized practice of law, only as long as those title examinations are conducted or reviewed by Attorney Pelletier or some other attorney employed in a similar manner.

Moving on to the drafting of deeds, residency affidavits, and powers of attorney in the *Balkun* matter, the drafting of those documents for the seller in a real estate transaction in which Balkun Title is not issuing the title insurance policy, as was the case in the 60 Pine Hill Road transaction, constitutes the unauthorized practice of law. This is so because, when acting on behalf of a seller, the individual conducting a closing is not engaged on behalf of a title insurer. Balkun Title may not draft any of these documents if it is not issuing the title insurance policy for the real estate transaction. It may draft a deed in conjunction with issuing the title insurance policy, but only if the drafting is done by an attorney or reviewed by an attorney.

# C

## *In re SouthCoast Title and Escrow, Inc.*

As to SouthCoast, we hold that it did not engage in the unauthorized practice of law by conducting a real estate closing or a title examination.[17]

With respect to conducting closings, SouthCoast, as testified to by Attorney Senerchia, conducted a real estate closing at 60 Pine Hill Road. Unlike Balkan Title's role as simply representing the sellers, SouthCoast's role was to act on behalf of the title insurance company that issued the buyers' title insurance on the property. As we have explained earlier in this opinion, conducting a closing under these circumstances is explicitly authorized by the statute and we do not consider it to constitute the unauthorized practice of law. Accordingly, we decline to adopt the Committee's recommendation and instead hold that SouthCoast did not engage in the unauthorized practice of law by conducting a real estate closing. However, in the future, SouthCoast must comply with the requirements outlined above concerning the notice that it must give the buyer and seller at the closing.

With respect to the title examination, SouthCoast, again serving as the title insurance company, had its agent, Attorney Senerchia, examine a title to determine marketability and insurability. That complies with the requirement that we have adopted in this opinion. Attorney Senerchia, a duly admitted member of the Rhode Island Bar, performed this activity as an agent of

---

[17] As part of the Committee's analysis explaining why it determined that SouthCoast was engaging in the unauthorized practice of law but Attorney Senerchia was not, the Committee characterized SouthCoast as acting as a law firm in the context of these matters because it was providing legal services to its customers. We decline to adopt this characterization because, although SouthCoast's activities may have benefited its clients, it did not act on behalf of its clients. Attorney Senerchia as an employee of SouthCoast provided those services to SouthCoast, not the client. SouthCoast had its employee, Attorney Senerchia, perform an activity as part of SouthCoast's issuance of title insurance and did not have its employee perform a legal service on behalf of the buyer. The same is true as to Attorney Pelletier's work for Balkun Title.

SouthCoast.  Therefore, we decline to adopt the Committee's recommendation and instead hold that SouthCoast did not engage in the unauthorized practice of law by conducting a title examination.


Justice Goldberg did not participate.

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | In re William E. Paplauskas, Jr.<br>In re Daniel S. Balkun and Balkun Title & Closing, Inc.<br>In re SouthCoast Title and Escrow, Inc. |
| **Case Number** | No. 2018-161-M.P.<br>No. 2018-162-M.P.<br>No. 2018-163-M.P. |
| **Date Opinion Filed** | May 29, 2020 |
| **Justices** | Suttell, C.J., Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Per Curiam. |
| **Source of Appeal** | N/A |
| **Judicial Officer From Lower Court** | N/A |
| **Attorney(s) on Appeal** | For Unauthorized Practice of Law Committee:<br><br>Julie P. Hamil<br>Deputy General Counsel |
| | For Respondents:<br><br>Gregory P. Piccirilli, Esq.<br>Robert A. D'Amico, II, Esq.<br>Lauren E. Jones, Esq. |